FILED

NOV 1 7 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**STEPHANIE A. ROBINSON**
**6721 ROYAL THOMAS WAY**
**ALEXANDRIA, VIRGINIA 22315**
**(703) 550-9614**

CASE NUMBER   1:06CV01973

JUDGE: Emmet G. Sullivan

DECK TYPE: Personal Injury/Malpractice

DATE STAMP: 11/17/2006

**VS.**

**DEPARTMENT OF VETERANS OF AFFAIRS**
**810 VERMONT AVENUE**
**WASHINGTON, DC 20420**

### COMPLAINT

~~Dear U. S. District Court~~;

*COMPLAINT*

This ~~letter~~ is a request for consideration of the Federal Tort Claim regarding my

Father, Mr. Joseph Robinson, who died at the Department of Veterans Affairs

(VA), VA Medical Center, Nursing Home Care Unit in Washington, DC on April

27, 2003.  The Department of Veterans Affairs failed to ensure that proper

policies and procedures were met and maintained regarding patient care of my

Father at the Washington DC VA Medical Center Nursing Home Care Unit.  My

Father died on April 27, 2003, and I believe that his death was accelerated based

of a lack of good nursing care.  My Father was left unattended for a period of

more than five hours on the patio, without medication, water or just general

attention.  My Father was a patient at the Washington VA Medical Center

Nursing Home Care Unit since February 2001, he suffered from dementia, he

was legally blind from glaucoma, he was 92 years old, had a history of seizure disorders and congestive heart failure, and he was a grave "fall risk".

I filed a complaint with the VA Office of Inspector General on May 16, 2003, regarding the circumstances surrounding my Father's death and the Inspector General's office determined that the Washington VA Medical Center Nursing Home Care Unit Staff did not provide adequate nursing care and did not follow procedures required to care for my Father's safety and care on April 27, 2003. The Inspector General's office also noted inconsistencies in documentation of the care of my Father on April 27, 2003, and that the VA Medical Center did not comply with the medical center's Code Blu policy when they found my Father on the patio. **Bottomline, the Washington DC, VA Medical Center Nursing Home Care Unit did not provide my biological great uncle and adopted Father, Mr. Joseph Robinson with care that met acceptable standards, nor did they follow procedures required to ensure his safety. The Department of Veterans Affairs failed to abide by the Federal laws and VA policies and procedures by neglecting to care for my Father and impairing his quality of life due to an absence of minimal nursing care services. The Department of Veterans Affairs did not meet my Father's basic needs for care, by inadequately providing food, hydration and just plain nursing care. My Father was allowed to be in an unsafe and unsupervised condition for over five hours on Sunday, April 27, 2003.**

I filed a claim with the Veterans of Foreign Wars (VFW) Service Organization on April 27, 2004, who in turn forwarded the claim to the VA Office of General Counsel on April 29, 2004. The VA's Office of Regional Counsel denied my claim in an October 11, 2005, letter to me. On December 5, 2005, I forwarded the VA Office of General Counsel a letter and request that they reconsider my claim. On October 19, 2006, I received a voicemail message from an attorney in the VA Office of General Counsel. On October 23, 2006, I contacted the attorney and was told that the VA was adamant in their decision of "no cause", however they did feel that there was some exposure to liability for my Father's death and that the nursing care at the VA Medical Center, Nursing Home Care Unit in Washington, DC was an approximate cause in the issue of my Father's death. The attorney made me an offer of $25,000. I declined the offer. The attorney told me that was the maximum amount that they could offer under an administrative case as this one.

After being totally shocked, hurt, completely disappointed again, by the Department of Veterans Affairs, I decided to pursue my claim with the United States District Court so that the Court can decide more favorably on my Father's case, and my claim for $21,000,000.00. I would like for the United State District Court for the District of Columbia support my claim for $21,000,000.00, by deciding that the Department of Veterans Affairs must pay Mr. Joseph Robinson's daughter, me, Stephanie A. Robinson, the amount of $21,000,000.00, for failure to fulfill their responsibility of care for my Father. I

3

request $21,000,000.00 or an agreeable and reasonable amount that indicates their lack of care and lack of responsibility in providing adequate nursing care for Mr. Jospeh Robinson. There is no way that my Father's life, the memories of our life together, or the significant contributions he made to my life can be measured in a dollar amount when I reflect on his precious life. What he means to me cannot be measured monetarily, but I would expect the VA to offer a monetary amount that may reflect a gesture of justice for their lack of responsibility in caring for my Father on April 27, 2003, which ultimately led to his demise. I request that the U.S. District Court decide and rule on the side of what is right and just, and true -- that the Department of Veterans Affairs failed my Father, and failed their responsibility to this country to care for veterans. The Department of Veterans Affairs failed in their mission to fulfill President Abraham Lincoln's sacred pledge ".. to care for him who shall have borne the battle."

I have not received anything in writing from the VA Office of General Counsel regarding their final decision. However, after over three years of waiting for the Department of Veterans Affairs to do the right thing by my Father, I come away heartbroken and am now turning to the United States District Court for your assistance in helping to right a terrible wrong that occurred to my Father; a veteran of World War II, and Korea who served with dignity and loyalty. However, the VA has shown no dignity or compassion in caring for a dedicated World War II and Korea War veteran, a dedicated man of service and my Father. The VA has not responded favorably in this claim. The VA admitted that they are

4

culpable in the lack of nursing care that was provided to my Father, but they have not decided this claim in a manner that would indicate the dignity that should be paid to this World War II veteran they were charged to care for. I attached my letters to the Department of Veterans Affairs, and their responses for your review as a part of my claim to your office for your review.   And, I also would like to bring it to the Court's attention that the VA has taken over three years to render this unsatisfactory decision on my Father's death and I would appreciate your timely action for consideration, rather than the prolonged and agonizing time that they took to deny my claim. I have been extraordinarily patient, understanding of the bureaucratic process and excruciatingly timely in my filings with all Department of Veterans Affairs departments and I appreciate your consideration in your response to my request for disposition of my claim. Also, I would like to bring to the Court's attention my concern that by me taking this action, I am concerned that I not face negative consequences as an employee of the Department of Veterans Affairs. Please understand that I submit this claim to the court because it is my duty to my Father as his number one advocate, and as an advocate for the remaining residents of VA Medical Centers all over the country, and my duty as a veteran and a duty to this country. I close my letter to you with another quote by President Abraham Lincoln, "courage is not the absence of fear. It is going forward with the face of fear." It is those words that helps strengthen me to continue to fight this battle for my Father, without fear of retaliation or reprisal.

Thanking you in advance for your timely processing of this request for

consideration.  If you have any questions or need to speak with me call me at

(703) 550-9614 or (703) 801-8759.


Sincerely,

STEPHANIE A. ROBINSON
6721 Royal Thomas Way
Alexandria, VA  22315

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| STEPHANIE A. ROBINSON | DEPARTMENT OF VETERANS AFFAIRS<br>810 Vermont Avenue, NW<br>Washington, DC 20420 |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

6721 Royal Thomas Way
Alexandria, VA 22315
(703) 550-9614 or (703) 801-8759

ATTORNEYS (IF KNOWN)

CASE NUMBER  1:06CV01973

JUDGE: Emmet G. Sullivan

DECK TYPE: Personal Injury/Malpractice

DATE STAMP: 11/17/2006

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 3 Federal Question (U.S. Government Not a Party)

◉ 2 U.S. Government Defendant

○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP... FOR PLAINTIFF...

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ◉ 1 | ◉ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**○ A. Antitrust**

410 Antitrust

**◉ B. Personal Injury/ Malpractice**

310 Airplane
315 Airplane Product Liability
320 Assault, Libel & Slander
330 Federal Employers Liability
340 Marine
345 Marine Product Liability
350 Motor Vehicle
355 Motor Vehicle Product Liability
360 Other Personal Injury
362 Medical Malpractice
365 Product Liability
368 Asbestos Product Liability

**○ C. Administrative Agency Review**

151 Medicare Act

**Social Security:**
861 HIA ((1395ff)
862 Black Lung (923)
863 DIWC/DIWW (405(g)
864 SSID Title XVI
865 RSI (405(g)
**Other Statutes**
891 Agricultural Acts
892 Economic Stabilization Act
893 Environmental Matters
894 Energy Allocation Act
890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

| **○ E. General Civil (Other)** | **OR** | **○ F. Pro Se General Civil** |
|---|---|---|

**Real Property**
210 Land Condemnation
220 Foreclosure
230 Rent, Lease & Ejectment
240 Torts to Land
245 Tort Product Liability
290 All Other Real Property

**Personal Property**
370 Other Fraud
371 Truth in Lending
380 Other Personal Property Damage
385 Property Damage Product Liability

**Bankruptcy**
422 Appeal 28 USC 158
423 Withdrawal 28 USC 157

**Prisoner Petitions**
535 Death Penalty
540 Mandamus & Other
550 Civil Rights
555 Prison Condition

**Property Rights**
820 Copyrights
830 Patent
840 Trademark

**Federal Tax Suits**
870 Taxes (US plaintiff or defendant
871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
610 Agriculture
620 Other Food &Drug
625 Drug Related Seizure of Property 21 USC 881
630 Liquor Laws
640 RR & Truck
650 Airline Regs
660 Occupational Safety/Health
690 Other

**Other Statutes**
400 State Reapportionment
430 Banks & Banking
450 Commerce/ICC Rates/etc.
460 Deportation

470 Racketeer Influenced & Corrupt Organizations
480 Consumer Credit
490 Cable/Satellite TV
810 Selective Service
850 Securities/Commodities/ Exchange
875 Customer Challenge 12 USC 3410
900 Appeal of fee determination under equal access to Justice
950 Constitutionality of State Statutes
890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. Habeas Corpus/ 2255 | ○ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| 530 Habeas Corpus-General 510 Motion/Vacate Sentence | 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | 895 Freedom of Information Act 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| 710 Fair Labor Standards Act 720 Labor/Mgmt. Relations 730 Labor/Mgmt. Reporting & Disclosure Act 740 Labor Railway Act 790 Other Labor Litigation 791 Empl. Ret. Inc. Security Act | 441 Voting (if not Voting Rights Act) 443 Housing/Accommodations 444 Welfare 440 Other Civil Rights 445 American w/Disabilities-Employment 446 Americans w/Disabilities-Other | 110 Insurance 120 Marine 130 Miller Act 140 Negotiable Instrument 150 Recovery of Overpayment & Enforcement of Judgment 153 Recovery of Overpayment of Veteran's Benefits 160 Stockholder's Suits 190 Other Contracts 195 Contract Product Liability 196 Franchise | 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊗ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
NEGLECT AND LACK OF CARE TO MR. JOSEPH ROBINSON  28 USC 1346

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ 21,000,000.00 | Check YES only if demanded in complaint |
|---|---|---|---|
| | | JURY DEMAND: | YES   ⊗ NO |

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES    NO ⊗    If yes, please complete related case form.

DATE 11/17/2006    SIGNATURE OF ATTORNEY OF RECORD  _Stephanie D. Evans_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.



**DEPARTMENT OF VETERANS AFFAIRS**
Office of the General Counsel
Washington DC 20420

JAN 1 0 2006

In Reply Refer To:

Ms. Stephanie A. Robinson                          021B:NSR
6721 Royal Thomas Way
Alexandria, VA  22315

Subject:  Administrative Tort Claim - Request for Reconsideration

Dear Ms. Robinson:

This is to acknowledge receipt of your facsimile, dated December 22, 2005 requesting reconsideration of your administrative tort claim previously denied by Baltimore, Maryland VA Regional Counsel.

To be timely filed, a request for reconsideration must have been received within 6 months of the date of mailing of the Regional Counsel's denial.

We have requested the Regional Counsel's files on this claim, and, assuming the request was timely received, we will begin our reconsideration.  While this will be accomplished as expeditiously as possible, you are advised that the Attorney General's regulations provide an agency 6 months to reconsider a claim, during which time your right to file suit on the claim is suspended.  Thereafter, you may either deem the claim denied by filing suit in Federal district court, or await an agency decision on the claim.

As soon as we have completed our reconsideration, we will advise you of our decision.

Sincerely yours,

Neil S. Richman
Deputy Assistant General Counsel

06 1973

**FILED**

NOV 1 7 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# STEPHANIE A. ROBINSON

**6721 Royal Thomas Way**
**Alexandria, VA 22315**
**(202) 565-5710 Office**
**(703) 550-9614 Home**
**(703) 801-8759 Mobile**

December 5, 2005

Department of Veterans Affairs
General Counsel (021B)
810 Vermont Avenue, NW
Washington, DC 20420

Re: Federal Tort Claim Regarding Mr. Joseph Robinson

Dear Department of Veterans Affairs, General Counsel;

This letter is a request for reconsideration of the Federal Tort Claim regarding my Father, Mr. Joseph Robinson, in response to the Department of Veterans Affairs, Office of Regional Counsel letter of October 11, 2005. The Office of Regional Counsel denied my claim that the Department of Veterans Affairs is responsible for the negligent and wrongful death of my Father, Joseph Robinson, while he was a patient at the VA Medical Center, Washington, DC on April 27, 2003.

I am dissatisfied, disappointed and heartbroken with the Office of Regional Counsel's decision. And, I would appreciate you timely action for reconsideration, rather than the prolonged and agonizing 16 months that it took the Regional Counsel's office to deny my claim. I have been extraordinarily patient, understanding of the bureaucratic process and excruciatingly timely in my filings with all Department of Veterans Affairs departments. I would appreciate that same type of consideration in your response to my request for final disposition of my claim within the six (6) months from the mailing of the final denial, as stated in the Department's correspondence to me of October 11, 2005, and in accordance with Part 14, Title 28, Code of Federal Regulations.

I also would like clarification on the timelines for this request for reconsideration of my claim, and my option to file suit in an appropriate United States District Court. I would like to ensure that the timelines do not run consecutive, while I am waiting for the final disposition from the Department of Veterans Affairs. Please advise soonest. Thanking you in advance for your timely processing of this reconsideration request.

Sincerely,

*Signed*

STEPHANIE A. ROBINSON



# DEPARTMENT OF VETERANS AFFAIRS
## OFFICE OF REGIONAL COUNSEL
1722 I Street, NW, 3rd Floor
Washington, DC 20421

*(202) 530-9420 - Telephone*
*(202) 530-9431 - Facsimile*

**BALTIMORE OFFICE:**
3900 Loch Raven Boulevard
Building 4
Baltimore, MD 21218

October 11, 2005

## CERTIFIED MAIL – RETURN RECEIPT REQUESTED

Ms. Stephanie Robinson
6721 Royal Thomas Way
Alexandria, VA 22315

Re: Your Federal Tort Claim regarding Joseph Robinson

Dear Ms. Robinson:

This is in reference to your administrative claim under the Federal Tort Claims Act. Your claim, dated April 27, 2004 and filed on July 17, 2004, for the amount of $21,000,000, generally alleges that VA staff failed to properly treat your father, and such failure resulted in his death on April 27, 2003.

We have carefully investigated the facts and circumstances surrounding the care provided to your father on April 27, 2003. The Department of Veterans Affairs sincerely regrets your loss, but we find no evidence that any act or omission by VA employees acting within the scope and course of their duties caused or contributed to Mr. Robinson's death. For these reasons, your claim is hereby respectfully denied.

If you are dissatisfied with this decision, a request for reconsideration of the claim may be filed with the Department of Veterans Affairs, General Counsel (021B), 810 Vermont Avenue, N.W., Washington, DC 20420. To be timely filed, this request must be received by VA prior to the expiration of six (6) months from the date of the mailing of this final denial. Upon filing such a request for reconsideration, VA shall have six (6) months from the date of that filing in which to make final disposition of the claim, and your option to file suit in an appropriate United States District Court under Section 2675(a), Title 28, United States Code, shall not accrue until six (6) months after the filing of such request for reconsideration (Section 14.9, Title 28, Code of Federal Regulations).

In the alternative, if dissatisfied with the action taken on this claim, you may file suit in accordance with the Federal Tort Claims Act, Sections 1346(b) and 2671-2680, Title 28, United States Code, which provides that a tort claim that is administratively denied may be presented to a Federal district court for judicial consideration. Such a suit must be initiated within six (6) months after the date of the mailing of this notice of final denial as shown by the date of this letter (Section 2401(b), Title 28, United States Code). If you do initiate such a suit, you are further advised that the proper party defendant is the United States, not VA (Sections 1346(b) and 2671, Title 28, United States Code).

Sincerely,

FRANK D. GIORNO
Regional Counsel

2

August 2, 2004

Department of Veterans Affairs
Office of Regional Counsel
1722 I Street, NW 3rd Floor
Washington, DC  20421
Attn:  Ms. Alice L. Bishop

Re:  Administrative Tort Claim,
Mr. Joseph Robinson

Dear Department of Veterans Affairs;

This letter is in response to your July 27, 2004 letter regarding my administrative tort claim for the wrongful death of my Father, Mr. Joseph Robinson in the amount of $21,000,000.00, due to negligence of health care providers of the Department of Veterans Affairs.  I say to the Department of Veterans Affairs, what Mr. Joseph Robinson meant to me cannot be measured in dollars.  My Father's life and the memories of his contribution to my entire life is more precious beyond any dollar amount when measured by his life.

For the record I would like to clarify that I originally filed a claim with the Veterans of Foreign Wars (VFW) Service Organization on April 27, 2004, who in turn forwarded the claim to the Department of Veterans Affairs Office of General Counsel on April 29, 2004.  In following up on the status of my claim, I called the Office of General Counsel on June 18, 2004 and was told they had no record of the claim, therefore the VFW Service Office faxed the information to the Secretary's office for action.

In response to the specific information and evidence you requested in your July 27, 2004 letter, I submit the following:

1. A complete list by name, address, and dates of treatment, of any and all physicians, hospitals or other health care providers outside the VA system with who Mr. Robinson consulted for any reason since January 2001.  Mr. Robinson received his care exclusively at the Washington DC VAMC and was cared for by the physicians there.  I can name some if not all exclusively;

    - January 2001 - Dr. Sdia Khan, Jason Schneider, Dr. Leona Clarke, Dr. Michael Weiss, Ms. Mary Mrana, Dr. Banks, Dr. Cowan, Rick Evans
    - February 2001 – Dr. Wavell Hodge, Ms. Michelle Prispo, Ms. Karen Waters, Ms. Linda Wingo, Chndres Mahta, Dr. Harmon, Ms. Andrea Kriegstein, Harley, Ms. Mary Ann Wentzel, Ms. Bowman, Ms. Amelia Velasquez, Ms. Dorrence Carrington, Dr. Bhasin

- April 2001 – Mr. Larry Goldman, Ms. Mary Hill, Dr. Bhasin, Ashi, Ms. Hamilton, Marcelie, Lillian, Dora, Andrea
- May 2001 – Dr. Kheirbeck, Dr. Baer, Dr. Kim, Dr. Ponssky, Dr. Mozaaez, Dr. Jon White
- June 2001 – Dr. Rosenberg, Ms. Donna Bullis, Mr. Larry Trail
- July 2001 Dr. Sahoo
- October 2001 – Dr. Karen Blackstone, Mr. Goldman, Ms. Evelyn Romano
- 2001 to April 2003 – Ramona Jean, LaShawn, Betavia, Donna, Jackie, Ms. Jones, Helen, Georgia, Bettye Williams, Millie

I do not know the complete names of the entire nursing staff and most are referred to by first name, but they all work at the H and K Wings at the Nursing Home Care Unit at the Washington VAMC.

2. Those who attributed to the negligence attributable to the alleged negligence of VA health care providers in their treatment of Mr. Robinson are Mr. Evelyn Romano, Mr. Garfunkel, Director and Ms. Margaret Downing as well as the Nursing Staff on duty during the weekend of Mr. Robinson's death. The attached Department of Veterans Affairs Office of Inspector General Report of Investigation details nature and extent of the lack of treatment provided to Mr. Robinson on April 27, 2003.

3. Mr. Robinson was a retired military member of World War II and the Korean War; he was not employed and lost no wages. The wages lost are wages that would have been paid to Ms. Julie Anson to continue his daily custodial care if he had not died at the VA on April 27, 2003. We paid Ms. Anson $550.00 a week to care for Mr. Robinson at the VA Nursing Home Care Unit.

4. Again, Mr. Robinson was not employed.

5. Itemized bills for burial expenses incurred by reason of the incident causing death, or itemized receipts of payment for such expenses total $5, 619.01. Copies of receipts are attached.

6. I have no opinion from a physician indicating that the VA was negligent in providing medical care to Mr. Robinson, however the attached Office of Inspector General Report of Investigation outlines negligence by the Washington VAMC's staff.

7. Attached is a copy of a Power of Attorney, and a January 2003 letter from Dr. Blackstone, writing a letter on behalf of Mr. Joseph Robinson confirming that I was solely responsible for managing Mr. Robinson's affairs.

2

8. A copy of a death certificate is enclosed as well as the Government of the District of Columbia, Office of the Chief Medical Examiner Autopsy Report.

9. Mr. Robinson is a widow, and his survivors include me his adopted daughter and biological niece, Stephanie A. Robinson, 6721 Royal Thomas Way, Alexandria, Virginia 22315. Also, Mr. Robinson's caregiver, Ms. Julie Anson, 7357 Rhondda Drive, Lorton, Virginia 22079. Ms. Anson was dependent upon Mr. Robinson for support at the time of his death, because although not biological family, she was an important part of Mr. Robinson's care and support.

10. Mr. Robinson and I employed Ms. Julie Anson as his primary caregiver from July 1992 to the time of his death. She worked 5 to 7 days a week caring for him physically, emotionally and spiritually. She loved him and he loved her dearly like a daughter. The support afforded by Mr. Robinson to me, Stephanie A. Robinson cannot be measured in dollars. He raised me from a very small child to a young woman, and then he came to share my home with me in 1992. He was the emotional foundation in my life for 48 years and there is no way to measure what that means to me.

11. Mr. Robinson's general physical and mental condition before death, Mr. Robinson was a strong man both mentally and physically. Although hampered by his 100% disability for his eyes, and other medical concerns that plagued him, he was still strong and loved life and his family. He always told people around him that he would live to be 106 years old, and with his spirit for life, and love, and his will and resounding ability to bounce back from major illnesses, Julie Anson and I believed that he would live well past 100 years old. He definitely had the loving support group in Julie and myself, which fostered his spirit to continue to live.

12. All pain and suffering should be detailed in Mr. Robinson's medical records at the Washington VAMC.

13. The VA Office of Inspector General Report of Investigation provides evidence and information that has a huge bearing on the responsibility of the United States for the death and damages claimed.

The signed medical information release for is signed and enclosed in order for you to obtain copies of Mr. Robinson's medical records from whatever VA and non-VA medical facilities you need to properly evaluate this claim.

Please contact me if clarification is needed on any matter in this letter, my home phone is (703) 550-9614, my work phone is (202) 565-5710 and my mobile phone is (703) 801-8759. Request your thorough and complete review of this matter.

3

And finally, "...we don not know the true value of our moments until they have undergone the test of memory..." My Father, Mr. Joseph Robinson is more precious beyond words and there is no credible way to place a dollar value on his life and his contributions to the lives of those that he nurtured, shaped and loved. I am a product of his love and caring and I continue to memorialize his love and memory. This claim is one of the things I believe is the right thing to do, to help ensure this tragic circumstance does not occur to other elderly veterans in the care of the Department of Veterans Affairs, an institution whose mission is to care for veterans.

Sincerely,

*Stephanie A. Robinson*

Stephanie A. Robinson
6721 Royal Thomas Way
Alexandria, VA 22315

Enclosures attached.

4



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF REGIONAL COUNSEL**
1722 I Street, NW, 3rd Floor
Washington, DC 20421

*(202) 530-9420 - Telephone*
*(202) 530-9431 - Facsimile*

**BALTIMORE OFFICE:**
3900 Loch Raven Boulevard
Building 4
Baltimore, MD 21218

July 27, 2004

Ms. Stephanie A. Robinson
6721 Royal Thomas Way
Alexandria, VA 22315

      Subject: Administrative Tort Claim

Dear Ms. Robinson:

This acknowledges our receipt on July 16, 2004, of your administrative tort claim, dated
April 27, 2004, for wrongful death in the amount of $21,000,000.00 due to the alleged
negligence of health care providers of the Department of Veterans Affairs in providing
medical care to Mr. Joseph Robinson prior to his death on April 27, 2003. We note that
your claim was received by the Office of General Counsel for the Department of
Veterans Affairs on June 18, 2004, and it was then forwarded to our office for action.
The claim will be processed under the provisions of the Federal Tort Claims Act, Title
28, United States Code, sections 1346(b), 2671-2680, and the Attorney General's
Regulations, Title 28, Code of Federal Regulations, sections 14.1–14.11. The attorney
assigned to investigate your claim is Ms. Alice L. Bishop of this office.

The Attorney General's Regulations require that you provide us with certain information
and evidence that we need to process and investigate administrative claims. Accordingly,
please provide us with the following promptly, unless it is inapplicable to this claim or
has already been provided, in which case your response should so state:

      1. A complete list by name, address, and dates of treatment, of any and all
physicians, hospitals, or other health care providers outside the VA system with whom
Mr. Robinson consulted for any reason since January of 2001.

      2. From among those listed in response to (1) above, please identify all of those
consulted for symptoms which you contend were or are directly attributable to the alleged
negligence of VA health care providers in their treatment of Mr. Robinson, AND please
provide copies of any written reports they prepared which set out their diagnosis, the

nature and extent of treatment they provided Mr. Robinson, any degree of temporary or permanent disability, to include any diminished earning capacity, and the prognosis, along with the bills and receipts for all such treatment.

3. If lost wages are included in this claim, please provide written verification from each of the employers involved of the dates of employment, hours of employment (full or part-time), wage amounts, positions held, and dates of absence attributable to the alleged negligence of VA health care providers in their treatment of Mr. Robinson.

4. If Mr. Robinson was self-employed, and lost wages are included in this claim, please provide documentary evidence showing the amount of earnings actually lost along with copies of his income tax returns for the past five years, the position he held and the dates of absence attributable to the alleged negligence of VA health care providers in their treatment of Mr. Robinson.

5. Itemized bills for medical and burial expenses incurred by reason of the incident causing death, or itemized receipts of payments for such expenses.

6. If you have an opinion from a physician indicating that the VA was negligent in providing medical care to Mr. Robinson, please provide us with a copy. Any such opinion should set out the applicable standard of care, indicate how it was violated, and state the effect of such violation on Mr. Robinson.

7. A certified copy of the letters of administration appointing you as the personal representative of Mr. Robinson's estate.

8. An authenticated death certificate or other competent evidence showing cause of death, date of death, and the age of the decedent.

9. The full names, addresses, birth dates, kinship, and marital status of Mr. Robinson's survivors, including identification of those survivors who were dependent for support upon Mr. Robinson at the time of his death.

10. The degree of support afforded by Mr. Robinson to each survivor dependent upon him for support at the time of death.

11. Mr. Robinson's general physical and mental condition before death.

12. If damages for pain and suffering prior to death are claimed, a physician's detailed statement specifying the injuries suffered, duration of pain and suffering, any drugs administered for pain, and Mr. Robinson's physical condition while under that physician's care.

13. Any other evidence or information that may have a bearing on the responsibility of the United States for the death or damages claimed.

2

I have also enclosed a medical information release for you to sign and return to this office. We will need this release to obtain copies of Mr. Robinson's medical records from non-VA medical facilities so we can properly evaluate this claim.

After reviewing the materials you provide, Ms. Bishop will contact you if she needs additional information. If you have any questions concerning this case, please contact her at (202) 530-9420. Thank you for your cooperation.

Sincerely,

PAUL G. THOMSON
Acting Assistant Regional Counsel

3



# Government of the District of Columbia
## Office of the Chief Medical Examiner

### AUTOPSY REPORT

**CASE NUMBER:** 03-1469

**NAME OF DECEDENT:** JOSEPH ROBINSON

**AGE:** 92 YEARS          **RACE:** BLACK          **GENDER:** MALE

**DATE OF DEATH:** APRIL 27, 2003          **AUTOPSY DATE:** APRIL 29, 2003

**PERFORMED BY:** SARAH M. COLVIN, MD

**FINAL DIAGNOSES**

1. Hypertensive and atherosclerotic cardiovascular disease
   A. Mild cardiomegaly (480g) with left ventricular hypertrophy (1.2 cm thickness)
   B. Marked arteriolonephrosclerosis
   C. Moderate coronary artery atherosclerosis
   D. Chronic passive congestion, hepatic

2. Pulmonary emphysema

3. Mild neuronal depopulation of the hippocampus

**CAUSE OF DEATH:**          HYPERTENSIVE AND ATHEROSCLEROTIC CARDIOVASCULAR DISEASE

**MANNER OF DEATH:**          NATURAL

03-1469
JOSEPH ROBINSON

## EXTERNAL EXAMINATION

The body is identified by toe tag. An OCME identification band is about the left ankle.

The body is that of a normally developed, well nourished black male measuring 67 inches in length, weighing 180 pounds and appearing the reported age of 92 years. The body is cool with non-apparent livor mortis. There is rigor mortis that is easily broken. The scalp and bear hear are white and measures ¼ inch in length. The irides are brown with corneal clouding; there are no petechial hemorrhages of the bulbar or palpebral conjunctivae. The nose and ears are unremarkable. The teeth are natural and in fair condition; there is no evidence of trauma to the lips or gums. The nasal and facial skeleton is intact by palpation. There is early greening on the abdomen and early skin slippage and blistering. The chest is symmetrical. The abdomen is flat and unremarkable. There are small, depigmented scars on the back. The neck, chest, abdomen, back and extremities are otherwise unremarkable. The external genitalia are those of a normal, adult male with uncircumcised penis and both testes descended. The anus is unremarkable.

There is no evidence of injury or medical therapy.

## INTERNAL EXAMINATION

BODY CAVITIES: The body cavities are entered *via* the usual Y-shaped incision revealing no excess fluids, secretions or hemorrhages in the pleural, pericardial or peritoneal cavities, or in the mediastinum or retroperitoneum. The diaphragm is intact. The organs are in their usual anatomic locations. The body cavities are lined by smooth surfaces, without adhesions. There is no evidence of blunt or penetrating trauma in the body cavities.

CARDIOVASCULAR SYSTEM: The heart weighs 480g and is mildly to moderately enlarged. The epicardium is smooth containing coronary arteries in a right dominant distribution which are show focal 50-70% stenosis in the proximal left anterior descending and right coronary arteries. The myocardium is brown and firm, without focal lesions. Left ventricular wall thickness is 1.2 cm. No focal myocardial lesions are found. The endocardium is unremarkable. There is slight myxoid change of the mitral and tricuspid valve leaflets, with multiple small areas of upward tenting; there is no change in the chordae tendineae. The great vessels arise and branch normally. The coronary ostia are patent. The descending aorta is moderately atherosclerotic and tortuous. There are no antemortem thrombi in the chambers or great vessels.

03-1469
JOSEPH ROBINSON

RESPIRATORY SYSTEM: The right lung weighs 610g; the left weighs 460g. The pleural surfaces are smooth and glistening, and there are the normal lobar divisions. The pulmonary parenchyma is severely congested and edematous diffusely. No focal lesions are found. The tracheobronchial tree is unremarkable. There are no thromboemboli in the proximal pulmonary arterial branches.

HEPATOBILIARY SYSTEM: The liver weighs 1430g. The capsule is intact and the anterior margin is sharp. The tan parenchyma has the normal consistency and lobular pattern on sections. The gallbladder is unremarkable, containing approximately 30 ml of bile, without stones. The common bile duct is patent and undilated. The portal vein is unremarkable.

PANCREAS: The pancreas is of the usual size, shape, color, texture and lobulated architecture.

GASTROINTESTINAL SYSTEM: The stomach contains approximately 150 mL of partially digested food. The mucosae of the esophagus, stomach and proximal duodenum are unremarkable except for autolysis. The appendix is present and the remainder of the small and large bowels is grossly normal. The rectum has unremarkable mucosa, containing feces but no foreign bodies.

GENITOURINARY SYSTEM: The kidneys weigh 180g. The capsules strip with ease to reveal coarsely granular cortical surfaces. Sections reveal normal internal architecture in the congested parenchyma. The collecting systems and ureters are patent, emptying into a normal urinary bladder containing a few mL of yellow urine. The prostate gland has firm, tan parenchyma, without enlargement or nodularity. The testes have unremarkable, soft, brown parenchyma.

HEMOLYMPHATIC SYSTEMS: The spleen weighs 110g. The capsule is intact. The soft, purple parenchyma has the normal follicular pattern on sections. No enlarged or abnormal lymph nodes are found in the body.

MUSCULOSKELETAL SYSTEM: The skeletal muscles are brown and firm. There are no palpable fractures of the long bones or axial skeleton.

ENDOCRINE SYSTEM: The pituitary, thyroid and adrenal glands are unremarkable.

NECK: There is no evidence of trauma to the anterior soft tissues. The laryngeal cartilages, hyoid bone and cervical spine are intact. The laryngeal mucosa and vocal cords are unremarkable. No excess fluids or secretions, nor foreign bodies are found in the laryngeal lumen or hypopharynx. Serial transverse sections through the tongue reveal no evidence of injury.

03-1469
JOSEPH ROBINSON

HEAD AND CENTRAL NERVOUS SYSTEM: The scalp is reflected following the usual intermastoid incision revealing no subcutaneous or subgaleal hemorrhages. The calvarium and bones of the base of the skull are intact. The dura is intact, without epidural or subdural hemorrhages. The brain weighs 1440g and has symmetric hemispheres and a normal gyral pattern. The leptomeninges are markedly cloudy and slippery. The arteries at the base of the brain are normally distributed and free of atherosclerosis. The brainstem, cranial nerve roots and cerebellum are unremarkable externally. There is no subarachnoid hemorrhage or any evidence of herniation. The brain is retained in formalin for later neuropathologic examination.

Vessels in the leptomeninges are congested, and the leptomeninges, particularly over the vertex are thick, cloudy and slippery. The vessels at the base of the brain are thin and delicate. Externally, the cerebral gyri and sulci over the convexity and laterally are unremarkable. No contusions are present, and no pressure markings are apparent at the base of the brain. The brainstem and cerebellum are unremarkable.

Multiple coronal sections of the cerebrum, horizontal sections of the brainstem and cerebellum and a midsagittal section of cerebellar vermis are made. The ventricles are dilated throughout and there is extension anterior beyond the temporal poles. The gray and white structures, substantia nigra, brainstem, and cerebellum are unremarkable including the cerebellar vermis. No hemorrhages, infarcts, tumors or contusions are seen.

Photographs are taken. Sections for microscopy are obtained from the left frontal cortex (NP1), the right frontal cortex and separate stripped leptomeninges (NP2) and the hippocampus (NP3).

## SPECIMENS

Submitted for toxicological analyses are samples of blood, bile, urine, vitreous humor, gastric contents, liver and brain. Sections are submitted for histology.

## MICROSCOPIC EXAMINATION

HEART: There is moderate myofiber hypertrophy. Collagenous replacement of myofibers is present, and is focally moderate. Perivascular fibrosis (small vessel disease) is moderate. No polymorphonuclear leukocytes are present between fibers.

LUNGS: Emphysematous change is moderate to marked. Hemosiderin laden macrophages are present in clusters, along with anthracotic staining. There are numerous foci of mild interstitial fibrosis of alveolar walls. The pulmonary vasculature is congested,

03-1469                                                              Page 5 of 5
JOSEPH ROBINSON

with slight intra-alveolar hemorrhage, and traces of edema. There are moderate degenerative myxoid changes in the walls of larger pulmonary artery branches, without inflammation.

LIVER: Architecturally normal parenchyma is notable for moderate to marked pericentral venous congestion. There is no fatty change, parenchymal inflammation, or interface activity, or other evidence of hepatitis; Councilman bodies and Mallory's hyaline are not seen. Some portal triads exhibit small focal areas of infiltration with mononuclear cells, lymphocytes.

KIDNEY: Markedly thyroidized tubules occupy most of the cortex. Glomeruli are sclerotic. There are numerous foci of interstitial chronic inflammation. Small arteries show both hypertensive and atherosclerotic change with evidence of onion-skinning.

BRAIN: The sections of brain show only mild neuronal depopulation of the endplate and Sommer's sector of the hippocampus. The leptomeninges are thickened and edematous, but do not show inflammatory cells.


*Sarah M Colvin, MD*                                      *Aug 21, 2003*
Sarah M. Colvin, MD                                        Date Signed
Deputy Medical Examiner



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**OFFICE OF THE CHIEF MEDICAL EXAMINER**
1910 Massachusetts Avenue, S.E., Bldg. 27
Washington, D.C. 20003

**Toxicology Laboratory**

## TOXICOLOGY REPORT

### CASE IDENTIFICATION

| | | | |
|---|---|---|---|
| Agency: | OCME | Report Date: | 06-18-2003 |
| Agency Number: | **03-1469** | Toxicology Number: | TX03-0489 |
| Name: | ROBINSON, Joseph | ME: | SMC |

### SPECIMEN(S) RECEIVED

Subclavian blood (2), heart blood (2), urine, bile, vitreous, liver, brain, gastric
Date Received:    04-30-2003

### RESULTS

Subclavian blood was screened by headspace gas chromatography for the presence of ethanol, acetone, acetaldehyde, methanol, and isopropanol. The following volatiles were detected:
**None were detected**

Subclavian blood was screened by enzyme immunoassay for the presence of amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine metabolites, methadone, methamphetamines, opiates, phencyclidine and propoxyphene. The following drug(s) were detected:
**None were detected**

Subclavian blood was screened by gas chromatography-mass spectrometry for basic drugs. The following drugs were detected:
**None were detected**

RORY M. DOYLE, M.Sc.
Deputy Chief Toxicologist, OCME

FIONA J. COUPER, Ph.D.
Chief Toxicologist, OCME

**AMERICAN MEDICAL LABORATORIES, INC.®**

P.O. Box 10841 • 14225 Newbrook Drive
Chantilly, VA 20153-0841
(703) 802-6900 • (800) 336-3718 • www.aml.con

```
ROBINSON, JOSEPH          49924439/0          92 YEARS    MALE
    Page   1  From Chantilly    FOR COLVIN, SARAH                  X
    COLLECTED:  NP             25458 OFFICE OF THE CHIEF MEDICAL
    RECEIVED:   05/02/2003           EXAMINER / BLDG 27
    REPORTED:   05/06/2003           1910 MASSACHUSETTS AVE SE
2003/  0/ 25458/  0/37138126         WASHINGTON DC 20003
    HISTORY NO: OCME 03-1469
```

```
---------------TESTS------------RESULTS-FLAG--REF. RANGE------UNITS
```

13094/Chantilly
Autopsy
        Results reported.

663/Chantilly
CULTURE, ABSCESS OR WOUND
   SOURCE : LEPTOMENIGITIS

                    ORGANISM(S) ISOLATED
------------------------------------------------------------------
   1.  Heavy growth of Enterococcus faecalis

------------------------------------------------------------------
   2.  Heavy growth of Staphylococcus aureus

------------------------------------------------------------------
   3.  Moderate growth of Lactobacillus species
------------------------------------------------------------------

                    *** FINAL REPORT ***
   [P 78417]-[S 6857]

---

Age and sex dependent reference ranges are printed when available
if age and sex are designated.  Otherwise, adult values are given.
167074 R 7/02

**NATHAN SHERMAN, M.D.**
**DIRECTOR OF LABORATORIES**



# Department of Veterans Affairs
# Office of Inspector General

## Healthcare Inspection

## Quality of Care Issues
## Washington DC Veterans Affairs
## Medical Center

Report No. 03-02140-150                                        May 20, 2004

VA Office of Inspector General
Washington, DC  20420



**DEPARTMENT OF VETERANS AFFAIRS**
Office of Inspector General
Washington DC 20420

**TO:**      Director, VA Capitol Healthcare Network (10N5)

**SUBJECT:** **Final Report** — Healthcare Inspection – Quality of Care Issues, Washington, DC Veterans Affairs Medical Center – Report Number: 03-02110-150

## 1.    Purpose

The Department of Veterans Affairs (VA) Office of Inspector General's (OIG) Office of Healthcare Inspections (OHI) and Office of Investigations initiated an inspection in response to allegations of inadequate care provided to a patient at the Washington, DC Veterans Affairs Medical Center (VAMC) Nursing Home Care Unit (NHCU). The purpose of the review was to determine whether the allegations had merit.

## 2.    Background

The patient was a 92-year-old male diagnosed with chronic obstructive pulmonary disease, congestive heart failure, dementia, glaucoma, seizure disorder, and prostate cancer. He had a history of deep vein thrombosis, difficulty swallowing, falls, and frequent urinary tract infections. He had been a resident of the NHCU's H Wing since February 2001. The complainant (the patient's niece) paid a private attendant to assist the patient with his care Mondays through Fridays from 10:00 a.m. until 5:30 p.m. The patient also received daily assistance with his activities of daily living (ADLs) from a VAMC restorative aide. The complainant usually visited the patient on Sunday evenings and intermittently took him to her home on pass.

On April 27, 2003, a visitor found the patient unresponsive on the NHCU patio. NHCU employees called a Code Blu;[1] however, resuscitation efforts were unsuccessful. The complainant reported that some employees and other NHCU residents told her that her uncle was left unattended for several hours on the patio that afternoon, without medications or water. The complainant alleged that employee negligence might have contributed to the patient's unexpected death, and thus speculated it may have occurred under suspicious circumstances. She further alleged failure to follow policy, institutional cover-up, and that an employee was insensitive when informing her of the patient's demise.

---

[1] Advanced cardiac life support procedures (referred to as Code "Blue" in most facilities, but Code "Blu" in this facility).

### 3.    Scope and Methodology

OIG representatives conducted this inspection at the VAMC on May 28-30, June 2-4, and July 30-31, 2003. We reviewed the patient's medical records, nursing assignment sheets, pertinent policies, the Code Blu report, and the autopsy report.[2]  On June 3, 2003, a VAMC investigator and two OHI inspectors viewed NHCU video surveillance tapes for April 27, 2003.[3]   We interviewed the complainant, the patient's physician, clinical managers, staff nurses, and other employees knowledgeable about the patient or the events of that day. We also interviewed the patient's private attendant, other NHCU residents, and family members of former NHCU residents.

In addition to allegations related to the patient's death, the complainant made several other allegations of NHCU residents receiving inadequate care. The complainant alleged that she was told nurses provided food to residents that was harmful to their health and that residents were not regularly bathed.[4]   We reviewed patient complaint reports, but did not find any evidence of these problems.  We interviewed many current residents and family members of several former residents and only one resident reported a problem with bathing.

The complainant also alleged that nurses allowed a cognitively impaired patient to wander from room to room.  We reviewed this particular patient's medical records and found that the treatment team developed an appropriate plan to manage the patient's behavior in this restraint-free environment until another placement could be arranged.

The complainant further alleged that an H Wing nursing assistant worked double or triple shifts, and slept and did homework while on duty.  We confirmed that the named nursing assistant worked double shifts on the weekends, as she attended school during the week.  Double shifts are a common and acceptable practice in long-term care settings.   We reviewed the nursing assistant's personnel records and did not find any evidence of performance or conduct problems or documentation that she was ever counseled about sleeping or doing her homework while on duty.

We performed the inspection in accordance with the *Quality Standards for Inspections* published by the President's Council on Integrity and Efficiency.

---

[2] The autopsy was completed by the Office of the Chief Medical Examiner of the District of Columbia at the complainant's request.
[3] The VAMC investigator initially told us that the images would be kept for 60 days.  We attempted to secure the tapes on June 11, 2003, and learned that the April 27 recording had been overwritten.  The VAMC investigator then told us that he had been mistaken, and all recordings were overwritten after 6 weeks.
[4] The NHCU hygiene protocol requires nursing employees to give residents complete bed baths, showers, or tub baths weekly and as needed.

## 4.    Inspection Results

### Chronology of Events

Events of the 9 days prior to the patient's death were unremarkable. His vital signs, last recorded on April 18, 2003, were within normal limits for this patient. He spent 5 days (April 21-25) on pass at the complainant's home, and she reported that he was in excellent spirits and felt well during this time. April 26 records show that he refused his breathing treatment and received his 9:00 a.m. medications between 3:03 and 3:14 p.m.

On April 27, the patient received breakfast in his room, and reportedly ate well. The nursing assistant assigned to the patient assisted him in dressing for the day. Digital surveillance images from security cameras in the NHCU hallways and dining room monitored the patient's movement. We viewed the images and observed the patient wheel himself from his room at 10:38 a.m. into the hallway. He sat in the hallway across from his room until 11:38 a.m., when his assigned registered nurse (RN) gave him some medication. During the medication dispensing process, we saw that the RN did not scan the patient's armband before giving him the medications, as required by Bar Code Medication Administration (BCMA) procedures. The RN then wheeled the patient to the nursing station and took his blood pressure; however, the patient's medical record does not contain any information to confirm that this vital sign was measured. The medication administration record (MAR) shows that his 9:00 a.m. medications were given late; between 11:44 a.m. and 11:50 a.m. Records show that he again refused his breathing treatment. We then observed the patient wheel himself from the nursing station, past the dining room (where the lunch trays were being put on the tables), and out the door to the patio at 11:59 a.m.

The H Wing day shift charge nurse told us that she observed the patient wheel himself into his room "...to use the bathroom" between 1:00 and 1:30 p.m., and wheel himself out of his room between 1:30 and 2:00 p.m. The ADL flow sheet shows that the patient ate lunch on April 27; however, his nursing assistant told us that she erroneously made this entry and that he did not eat lunch. She told us that she learned from Nutrition Service employees around 12:30 p.m. that the patient had not eaten. She told us that sometime between 1:30 and 2:00 p.m., she spoke to him on the patio and he told her he did not want to eat as he was waiting for his niece.

The evening shift charge nurse told us that when she entered on duty around 3:30 p.m., she saw the patient through the patio window. She said he appeared to be napping. She reported his whereabouts during report.[5] Therefore, no one saw the need to check on him.

---

[5] Meeting held at shift change where nursing employees coming on duty are briefed about the status of the patients on that unit.

Security cameras did not visualize the main patio area. We observed all movement through the door to the patio between noon and 5:25 p.m. on April 27, and did not see the patient return from the patio at any time. We also observed all movement in the hall in front of the patient's room between 12:30 and 2:30 p.m., and did not see the patient re-enter his room at any time.

Surveillance footage showed that at 5:20 p.m., a visitor ran from the patio to the K Wing and returned with two RNs. He pointed out something to them on the patio and then we observed the three of them go outside. One of the RNs returned to the NHCU and met nursing employees from the H Wing. The K Wing nurses returned to their unit and the videotape showed two H Wing employees wheeling the patient (who was slumped in his wheelchair) to the H Wing and into his room at 5:25 p.m.

The patient had a current advanced directive that documented his "full code" status. H Wing employees told us that they wheeled the crash cart to the patient's room, placed the patient on his bed, tore away his clothing, and began basic cardiac life support (BCLS) while waiting for the Code Blu Team to arrive.

We observed the Code Blu Team arrive at 5:28 p.m. According to the physician's progress note, dated May 30, 2003, the patient exhibited skin slippage and rigor mortis in the jaw, which made intubation impossible. Central line placement was also unsuccessful. The Medical Examiner (ME) who performed the autopsy told us that these conditions probably indicated that the patient had been dead for at least 2 hours prior to the Code Blu Team's arrival. The Code physician made the decision that further efforts would be futile and pronounced the patient expired at 5:38 p.m.

**Issue 1:** Nursing Employees' Provision of Care as Prescribed in Patient's Care Plan

We substantiated the allegation that nursing employees did not provide adequate care and did not follow procedures required to ensure the patient's safety on April 27. Despite the documented need for regular nursing intervention in the patient's medical record, we did not find any evidence that nursing employees had any contact with the patient between 11:59 a.m., when he entered the patio, and 5:20 p.m., when a visitor found him unresponsive. We interviewed all nursing employees responsible for the patient between noon and 5:00 p.m., and verified that none of them had any interaction with him during that time.

The patient's medical records contained documentation of his safety risk and his need for frequent monitoring in the doctor's orders, nursing monthly summary report, ADL flow sheets, and care plan. The patient's April 11, 2003, interdisciplinary treatment care plan related several active problems that demonstrated the patient's need to be frequently monitored by nursing employees. We collected the following evidence:

_High Safety and Fall Risk._  The interdisciplinary treatment team assessed the patient to be a high safety and fall risk due to his history of falls and his cognitive deficits.  His medical record clearly shows that he required the assistance of one person for all transfers (from bed to wheelchair, from wheelchair to toilet, etc.), was disoriented at times, and had "periods of restlessness."  The patient's medical record includes a doctor's order for high fall-risk precautions, a care plan requiring NHCU staff to "...check patient every 2 hours as per the high level safety risk protocol," and a March 15, 2003, safety assessment recommending "...frequent rounds" as a safety precaution to reduce his risk of falling.  In addition, ADL flow sheet entries between March 1 and April 27 show the patient to be a level-3 safety risk.  We asked several NHCU nursing employees what interventions were required for a level-3 safety risk, and all responded that such a patient had to be "...checked on every 2 hours."

_Frequent Urinary Tract Infections._  Adequate hydration and frequent emptying of the bladder is recommended to reduce the frequency of urinary tract infections.  The patient's care plan instructs nurses to "...offer water every 2 hours while awake" and "...toilet every 2-3 hours."  The care plan designates nursing as the discipline responsible for implementing the strategies prescribed to manage these active problems.  We heard from several sources that nursing employees usually did not have to do much for the patient as he had his private attendant to assist him during the week and the restorative aide on the weekends.  However, on Sunday, April 27, the restorative aide was detailed to perform other duties.  Other residents told us that care was not as good on the weekends as was the case during weekdays.  They said there were fewer nurses and they were slower to respond.  In addition, we learned that the patient's assigned nursing assistant was sent to look for a missing patient after lunch, which took her away from the unit.  These factors likely contributed to NHCU nurses' inattention to the patient.

_Compromised Nutritional Status._  The care plan indicates that the patient should "...maintain meal intake at 75-95 percent."  Although the medical record reflects that he ate lunch on April 27, his assigned nursing assistant told us that she learned the patient never entered the dining room to eat his lunch.  She said he skipped his lunch because his niece was bringing him supper.  Given the care plan goal, nursing employees should have encouraged him to eat his lunch.

The patient was 92-years old, legally blind, cognitively impaired, and had a history of seizures and falls.  His care plan instructs nursing employees to check on him every 2 hours, yet employees did not check on him for more than 5 hours, even after he failed to appear for lunch.  We concluded that nursing employees did not fulfill their duties as defined in the patient's care plan.

**Issue 2:**  Institutional Cover-Up

We did not substantiate the allegation that VAMC managers attempted to cover up the incident, but we noted inconsistencies in documentation and interview statements that may reflect individual NHCU employees' efforts to minimize their own accountability.  We had difficulty determining staff assignments.  We

received conflicting statements from several NHCU employees regarding who was assigned as charge nurse during the day shift, who made staff assignments, and which RN had responsibility for the patient's care that day. The following examples illustrate the inconsistencies noted during the inspection:

*Lunch.* The nursing assistant assigned to the patient on April 27 day shift told us that it was not unusual for him to skip lunch when his niece was bringing him supper. Nutrition employees disputed this assertion. We reviewed ADL flow sheets for several months and found that even though the patient's niece almost always visited him on Sundays, he usually ate lunch.

The nursing assistant initially told us that she spoke to the patient on the patio between 1:30 and 2:00 p.m. We interviewed this witness approximately 2 months later, and she then told us that she did not actually speak to or have contact with him that afternoon. She told us she was looking for a missing patient on the patio around 2:00 p.m., and was "...probably told by another resident" that the patient was waiting for his niece. She said she may have seen the patient from a distance, but she did not interact with him.

*Independence.* Between March 1 and April 27, the patient was classified as a level-3 safety risk. Medical record documents show that the patient required assistance with transfers on each day, except for April 27, when "...independent in transfers" was documented for the first time. The RN who told us she saw the patient return to his room after lunch to go to the bathroom asserted he did this daily and that he transferred independently from his wheelchair to the toilet and back. However, other NHCU employees told us, and all available documentation indicates, that the patient required assistance with transfers. Additionally, we did not find any evidence to support the RN's assertion that she saw the patient wheel himself to his room around 1:30 p.m. on April 27. The video surveillance tape we reviewed did not show the patient re-entering from the patio or entering his room between 11:59 a.m. and 5:25 p.m.

*Code Blu.* The nursing assistant assigned to the patient during the April 27 evening shift told us that she was one of several H Wing employees who transported him from the patio to his room at 5:25 p.m. The video surveillance tape did not confirm her account. Other witnesses did not corroborate the nursing assistant's statement regarding the CPR process, the length of the shift change report, or the patient's customary behaviors.

**Issue 3:** Staff Insensitivity

We could not substantiate the complainant's allegation that the geriatric fellow[6] who informed the complainant about her uncle's death was insensitive to the situation. We interviewed the geriatric fellow and the patient's attending physician. The geriatric fellow first telephoned the complainant's home, but got no answer. The two physicians told us that they discussed the appropriateness

---

[6]A physician in post residency specialty training in Geriatric Medicine.

of notifying the complainant by cell phone before the geriatric fellow attempted to contact the complainant again. The geriatric fellow told us that she attempted to temper the news by beginning with information about the CPR efforts. When the complainant asked how her uncle was, the geriatric fellow responded, "He died." The complainant perceived this statement as insensitive.

The geriatric fellow speaks English as a second language, which may have contributed to any awkwardness in message delivery and to the complainant's perception of insensitivity. We reviewed the geriatric fellow's personnel training records and confirmed that earlier in her residency, she had received the requisite sensitivity training regarding notification of next of kin about the death of a loved one.

**Issue 4:** Suspicious Death

We did not substantiate the allegation that the patient died under suspicious circumstances. The autopsy report states that the manner of death was "natural" and the cause of death was "hypertensive and atherosclerotic cardiovascular disease." The autopsy report also states "...there was no evidence of injury on external or internal examination." The autopsy did not identify a specific event or set of events that led to the patient's death. An OHI physician reviewed the autopsy report and reached the same conclusion.

The complainant was concerned that NHCU employees left her uncle unattended on the patio without water or medications for an extended period on a particularly warm day. We verified that the high temperature on April 27 was 71 degrees with 38 percent humidity around 3:00 p.m. Witnesses, including the complainant, told us that the patient enjoyed sitting on the patio. The April 27 NHCU video surveillance tape showed the patient independently wheeled himself from the nursing station, past the dining room where employees were serving lunch, and to the patio at 11:59 a.m.

Although we could not determine if the patient received anything to eat or drink from any source after he entered the patio, we verified that he received breakfast and all medications including his 5:00 a.m. breathing treatment. Documentation shows that he refused his 11:00 a.m. breathing treatment, and was not due additional medications until 5:00 p.m. The patient's RN that morning told us the patient was feeling well and that his vital signs were unremarkable. (We did not find any documentation of these vital signs in the patient's medical records; however, the RN later provided us with the sheet on which she recorded them.) OHI physicians reviewed the patient's medical records and did not identify any significant lapses in his medical care.

**Issue 5:** Additional Concerns

*Code Blu Process*. We found that VAMC employees did not comply with the medical center's Code Blu policy when they found the patient on the patio. The patient had an active full code status documented in his medical record. Policy

7

states, "...any trained person present at the site of code/arrest will initiate cardio-pulmonary resuscitation (CPR) measures per American Heart Association (AHA) guidelines." The Chairman of the Code Blu Committee reviewed the Code Blu on this patient at our request. He wrote, "It is....described that BCLS is started after the Nursing Staff arrive, but then the patient is 'brought back to his room.' It is unclear why the patient was moved, and it would seem unlikely that effective CPR could be maintained during the transfer." CPR should have been initiated on the patio where the patient was found unresponsive. Instead, NHCU employees returned him to his room and placed him on his bed before initiating CPR.

The Code Blu process was not documented as required by local policy, nor had the code been critically analyzed, which made it difficult to determine if appropriate steps were taken. We did not find any progress notes from the resident in charge of the Code Blu or the surgical resident responsible for airway management, as required. The Chairman of the Code Blu Committee concluded that, "The events of the Code Blu are somewhat confusing and inadequately documented." The Quality Management Code Blu worksheet documentation was incomplete as well. We discussed the documentation issue with the Chief of Staff, who directed the resident physician in charge of the Code Blu to enter a late entry note on May 30, 2003.

Inadequate Code Blu worksheet documentation was an acknowledged problem at the VAMC. We reviewed Code Blu Committee meeting minutes for the first three quarters of fiscal year 2003, and did not find any evidence that committee members had followed-up on problems with Code Blu worksheet documentation identified in October 2002.

*Bar Code Medication Administration.*  Some NHCU nurses did not comply with BCMA procedures. The patient's MAR shows that on April 26, the patient received his 9:00 a.m. medications between 3:03 p.m. and 3:14 p.m. The responsible nurse told us that she administered the patient's 9:00 a.m. medications within the time frame permitted (60 minutes of the scheduled medication time), but that she did not document this in BCMA until after 3:00 p.m. To do this, the nurse would have had to manually enter the patient's name and medications into BCMA, which violated procedure and circumvented BCMA safeguards. BCMA procedures require that nurses electronically scan patients' armbands and medications during medication administration.

The medical record also indicates that the patient refused his 11:00 a.m. breathing treatment. Although the BCMA program prompts (and the procedure requires) the user to enter a comment when medications are administered late or refused, no comments were entered.

We reviewed the MARs for several NHCU residents and found that late medication administration was a common practice that frequently generated complaints to the patient advocate. Pharmacy Service managers told us that despite requirements and education, NHCU nurses continued to work around the

system and bypass comment prompts. NHCU managers acknowledged they were aware that some nurses were not always in compliance with BCMA procedures. They told us that the number of NHCU patients on multiple medications made it difficult to comply with BCMA timeframes. They also explained that the BCMA system was relatively new and difficult for recently hired and less computer literate nurses. They did not consider late medication administration a medication error; therefore, occurrences were not reported or tracked.

We discussed our concerns with the Medical Center Director and later received a report from the VAMC that outlined measures implemented subsequent to our inspection to assure "...continuous improvement and full compliance" with BCMA guidelines.

## 5.    Conclusions

Nursing employees responsible for this patient on April 27, 2003, did not provide him with care that met acceptable standards, nor did they follow procedures required to ensure his safety. The patient's care plan required nursing employees to check on him every 2 hours and to offer him water and assistance with toileting. We confirmed that none of the nursing employees assigned to the patient had any interaction with him for more than 5 hours, even after he failed to appear for lunch and although he was 92 years old, cognitively impaired, legally blind, and had a history of seizures and falls. Although nursing employees' actions, or lack thereof, did not cause the patient's death, in our opinion their actions reflected a significant disregard for their responsibilities.

Employees did not comply with local Code Blu policy in that they did not initiate immediate CPR procedures where the patient was found unresponsive, and did not record important aspects of the Code Blu procedure in the patient's medical record. Similarly, employees did not comply with required patient safety aspects of the BCMA procedure when they recorded medication administration long after medications were administered.

## 6.    Recommendations

The VISN Director should ensure that the Medical Center Director requires that:

a.    Administrative action is taken against NHCU employees who failed to complete duties as assigned.

b.    Responsible NHCU managers are held accountable for serious lapses in patient care and employee non-compliance with policy.

c.    NHCU nursing employees monitor high safety and fall risk patients in accordance with established protocol.

d.    Responsible managers conduct a NHCU-wide evaluation of employees' compliance with instructions as outlined in patients' care plans, and initiate corrective actions as indicated.

e.    Responsible managers evaluate overall facility compliance with Code Blu policy related to performance and documentation, and initiate training as indicated.

f.    NHCU nurses comply with BCMA operational and documentation procedures.

## 7.    VISN and Medical Center Directors' Comments

The VISN and Medical Center Directors agreed with the OIG's findings and recommendations and offered corrective actions as indicated.  (See Appendix B on page 12 for the full text of the Medical Center Director's comments).

## 8.    Inspector General's Comments

The VISN and Medical Center Directors agreed with the report's findings and recommendations.  The Medical Center Director's corrective action plans were responsive to the recommendations. We will follow-up on the planned actions.

JOHN D. DAIGH JR., M.D.
Assistant Inspector General for
  Healthcare Inspections

## VISN Director Comments

**Department of
Veterans Affairs**                    *Memorandum*

Date:   April 13, 2004

From :   VISN 5 Network Director

Subj:   Response to OIG Health Care Inspection, Washington DC VA Medical Center
Project number 2003-02110-HI-0263

To:     Ms. Peggy Seleski, Director, Management Review Service (10B5)

1.  VISN 5 has concurred with IG recommendations as noted in the attachment.

2.  Per the Inspector General's Office recommendations the Washington DC VA Medical Center has completed all action plans.

3.  If additional information is needed, please contact Archna Sharma, M.D. at 410-691-1142.

\\s\\
JAMES J. NOCKS, M.D., M.S.H.A.

Attachment

# Medical Center Director Comments



**DEPARTMENT OF VETERANS AFFAIRS**
Medical Center
50 Irving Street
Washington DC 20422

February 27, 2004

Director, Management Review Service (10B5)
VA Office of Inspector General
Washington, DC 20420

Dear Ms. Peggy Seleski,

This is in response to the draft report of the Healthcare Inspection-Project Number 2003-02110-HI0263, which describes the investigative findings of allegations of inadequate care provided to a patient at the Washington, DC Veterans Affairs Medical Center (VAMC) Nursing Home Care Unit (NHCU).

**Issue 1**: <u>Nursing Employees'Provision of Care as Prescribed in Patient's Care Plan</u>     **-Agree**
We agree with the findings regarding nursing care on Sunday, April 27th from 11:59 am-5: 20 pm in the Nursing Home Care Unit. During those hours, the assigned Nursing Assistant (NA) did not complete all the interventions that had been assigned to nursing in the interdisciplinary plan of care. The Registered Nurse (RN) supervising the NA on the day tour did not assure that all elements of the care plan had been completed.

The patient had been a long term resident in the NHCU, who began his second admission to the NHCU in February 2001. His health status improved after moving to the NHCU and he exhibited consistently good clinical outcomes and quality of life. He remained active, and on the day of his death he independently wheeled himself to the NHCU patio and joined the company of other patients.

**Issues 2-4**
I agree that the allegations addressed in Issues 2, 3 and 4 were not substantiated.
Issue 2: <u>Institutional Cover-Up</u>     **Findings: Not substantiated**
Issue 3: <u>Staff Insensitivity</u>     **Findings: Not substantiated**
Issue 4: <u>Suspicious Death</u>     **Findings: Not substantiated**

**Issue 5: <u>Additional Concerns</u>**

5A. <u>Code Blue Process</u>     **Agree**
The first nurse responders established the unresponsiveness of the patient and called for assistance. Nursing staff made the clinical decision to move this patient, who had clear signs of death, to his room instead of attempting further CPR on the concrete patio. The physician who responded to the Code Blu identified signs of rigor motis and pronounced the patient.
We agree that complete Code Blu team documentation, as well as a review of all codes by the code Blu Committee, is needed. The Code Blu Committee will identify whether CPR policy changes are indicated to clearly guide providers in cases of irreversible death.

5B. <u>Bar Code Medication Administration</u>     **Agree**
We agree that the RN administering the patient's medications did not follow BCMA procedures. BCMA is the standard in the VA and it is not acceptable for this RN to revert to a paper method except in emergencies.

However, although the electronic documentation of medication administration was late, the RN did assess the patient and give him his medications.

The medical center submitted a White Paper in July 2003, following this investigation, which described BCMA use at the DCVAMC as well as further actions we implemented to assure that all staff is in compliance. The Washington DC VAMC has been instrumental in the development of BCMA. Even though barriers still exist to maximum BCMA efficiency nation-wide, compliance will be assured while working to improve the system.

**6. Recommendations**

The recommendations from the draft report are listed below with our implementation action plans and/or alternative corrective actions planned.

| RECOMMENDATIONS | CORRECTIVE ACTIONS | TARGET DATE |
|---|---|---|
| 6a. Administrative action is taken against NHCU employees who failed to complete duties as assigned. | Written disciplinary action will be taken against:<br>• Team Leader for failure to follow policy and procedures for BCMA administration & failure to supervise nursing standards of care<br>• Nursing Assistant for failure to follow nursing plan of care. | 4/1/04<br><br><br><br><br>Resigned 2/04 |
| 6b. Responsible NHCU Managers are held accountable for serious lapses in patient care and employee non-compliance with policy. | Counsel NHCU Managers to address supervisory performance and control, to include staff compliance with policies and plan of care. | Completed |
| 6c. NHCU nursing employees monitor high safety and fall risk patients in accordance with established protocol. | Continue patient assessment & monitoring. | Ongoing |
| 6d. Responsible managers conduct an NHCU-wide evaluation of employees' compliance with instructions as outlined in patients' care plans, and initiate corrective actions as indicated. | Use of KARDEX tool that lists the patient level of care and nursing interventions from the interdisciplinary plan of care. | 2/10/04 |
| | Nurse Managers, Nursing Clinical Director, and Supervisors will make scheduled and unannounced rounds on all tours to assure compliance with standards. | Ongoing |

| | | |
|---|---|---|
| 6e. Responsible managers evaluate overall facility compliance with Code Blu policy related to performance and documentation, and initiate training as indicated. | Code Blu Committee will evaluate compliance with Code Blu policy; and system issues, including performance and documentation analyzed and reported to the Triad. Staff training will be initiated as indicated. | 3/1/04 |
| | Medical Director, NHCU will serve as an ad hoc member of the Code Blu Committee to participate in review of codes in the NHCU. | 3/15/04 |
| 6f. NHCU nurses comply with BCMA operational and documentation procedures. | Completion of Nursing Informatics process assessment on NHCU units during staff administration of medications to identify current BCMA implementation barriers. | Completed |
| | Memorandum issued to nursing staff reemphasizing the mandate for BCMA. | Completed |
| | BCMA competency retested. | Completed |
| | Monitor BCMA variance reports and address practice and system issues. | Ongoing |

Thank you for this advance review and the opportunity to comment. Further information or follow-up questions can be addressed to Cathy Delligatti, Director, Quality Management at 202-745-8517 or cathy.delligatti@med.va.gov.



SANFORD GARFUNKEL
Medical Center Director

# DISTRIBUTION

## VA Distribution

Secretary (00)
Deputy Secretary (001)
Chief of Staff (00A)
Deputy Chief of Staff (00A1)
Executive Secretariat (001B)
Acting Under Secretary for Health (10B5)
Deputy Under Secretary for Health (10A)
Chief of Staff, Under Secretary for Health (10B)
Deputy Under Secretary for Health for Operations and Management (10N)
Director, National Center for Patient Safety (10X)
Assistant Secretary for Public and Intergovernmental Affairs (002)
General Counsel (02)
Deputy Assistant Secretary for Congressional Affairs (009C)
Deputy Assistant Secretary for Public Affairs (80)
Office of the Medical Inspector (10MI)
Director, VA Capitol Healthcare Network (10N5)
Director, Washington DC VA Medical Center (688/00)

## Non-VA Distribution

Office of Management and Budget
U. S. General Accounting Office
Congresswoman Eleanor Holmes Norton, District of Columbia, At-Large
Congressional Committees (Chairmen and Ranking Members):
   Committee on Governmental Affairs, U.S. Senate
   Committee on Veterans' Affairs, U.S. Senate
   Committee on Appropriations, U.S. Senate
   Subcommittee on VA, HUD, and Independent Agencies, Committee
     on Appropriations, U.S. Senate
   Committee on Veterans' Affairs, U.S. House of Representatives
   Committee on Appropriations, U.S. House of Representatives
   Subcommittee on Oversight and Investigations, Committee on Veterans'
     Affairs, U.S. House of Representatives
   Subcommittee on Health, Committee on Veterans' Affairs, U.S. House
     of Representatives
   Subcommittee on Benefits, Committee on Veterans' Affairs, U.S. House
     of Representatives
   Subcommittee on VA, HUD, and Independent Agencies, Committee on
     Appropriations, U.S. House of Representatives
   Subcommittee on National Security, Emerging Threats, and International
     Relations, Committee on Government Reform, U.S. House of Representatives
Staff Director, Committee on Veterans' Affairs, U.S. House of Representatives
Staff Director, Subcommittee on Oversight and Investigations, Committee on
  Veterans' Affairs, U.S. House of Representatives

# VETERANS OF FOREIGN WARS OF THE UNITED STATES



Washington Regional Office
National Veterans Service Office
1722 I Street NW, Rm. 235
Washington, D.C. 20421-1111

Phone:    (202) 530-9385
Fax:      (202) 775-9475
E-Mail:   VFCRAWW@VBA.VA.GOV

April 29, 2004

Secretary of Veterans Affairs
810 Vermont Avenue NW
Washington, DC 20420

RE: Robinson, Joseph
XC 22-085-379

The following documents are submitted on behalf of the adopted daughter of the above veteran:

- Ms. Robinson is filing a "Tort Claim" contending wrongful death of her adopted father Mr. Joseph Robinson while in the VA Medical Center, Washington, DC. on April 27, 2003.
- Please note attached also is a request for investigation by the Office of Inspector General. To date, Ms. Robinson has not received a response to this request. She feels that the Department of Veterans Affairs has disregarded her request and has dishonored the memory of her adopted father and has left her no choice but to file this Tort Claim in hope of finding some answers to the questions that have been raised surrounding the death of this veteran while in the custody of the Department of Veterans Affairs.
- Standard Form 95
- Copy of complaint form (10-1349) filed with VA Medical Center, Washington, DC. dated April 28, 2003.
- Copy of death certificate for Mr. Robinson
- List of witnesses spoken with.
- Copies of medical records and notes obtained from VA Medical Center Washington, DC.

As the recognized power of attorney for Ms. Robinson relating to VA issues, it is requested that her claim is given expedited action considering it has been over a year since the death of the veteran and she has not received any response for the Department of Veteran Affairs.

Sincerely,

R.J. Walker
Outreach Service Officer

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 EXPIRES 6-30-01 |
|---|---|---|

| 1. Submit To Appropriate Federal Agency: | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, street, city, State and Zip Code) |
|---|---|
| Department of Veterans Affairs | STEPHANIE A. ROBINSON 6721 ROYAL THOMAS WAY ALEXANDRIA, VA- 22315 |

| 3. TYPE OF EMPLOYMENT MILITARY (CIVILIAN) | 4. DATE OF BIRTH 1-23-1965 | 5. MARITAL STATUS SINGLE | 6. DATE AND DAY OF ACCIDENT April 27, 2003 | 7. TIME (A.M. OR P.M) 5:38 P.M. |
|---|---|---|---|---|

**8. Basis of Claim** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof) (Use additional pages if necessary.)

I am claiming benefits as a result of negligence and wrongful death on behalf of my Uncle and Adopted Father, Joseph Robinson (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) He died at the Washington VAMC Nursing Home Care Unit after being left unattended for an extended period of 3-5 hours, outside on the patio VA Claim # 22-085-379.

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT(Number, street, city, State, and Zip Code)

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side)

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT

Mr. Joseph Robinson was left on the patio unattended for approximately 5 hours. He was a grave fall risk, in a 4-wheel chair, legally blind, Respiratory illness and he did not receive his medications during the timeframe left unattended.

| 11. | WITNESSES |
|---|---|

| NAME | ADDRESS(Number, street, city, State, and Zip Code) |
|---|---|
| See attached listing. | See attached listing. |

| 12. (See instructions on reverse) | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH $21,000,000.00 | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) $21,000,000.00 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.) | 13b. Phone number of signatory | 14. DATE OF CLAIM 4-27-2004 |
|---|---|---|
| Stephanie A. Robinson | | |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant shall forfeit and pay to the United States the sum of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the United States. (See 31 U.S.C. 3729.) | Imprisonment for not more than five years and shall be subject to a fine of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the United States. (See 18 U.S.C.A. 287.) |

| 95-108 Previous editions not usable | NSN 7540-00-634-4046 | STANDARD FORM 95 (Rev. 7-85) PRESCRIBED BY DEPT. OF JUSTICE 28 CFR 14.2 |
|---|---|---|

**PRIVACY ACT NOTICE**

This Notice is provided in accordance with the Privacy Act, 5 U.S.C 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

## INSTRUCTIONS

**Complete all items – Insert the word NONE where applicable**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A <u>SUM CERTAIN</u> FOR INJURY TO OR LOSS OF

Any instructions or information necessary in the preparation of your claim will be furnished, upon request, by the office indicated in item #1 on the reverse side. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplemental regulations also. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with said claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file claim for both personal injury and property damage, claim for both must be shown in item #12 of this form.

The amount claimed should be substantiated by competent evidence as follows:
(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT, THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN <u>TWO YEARS</u> AFTER THE CLAIM ACCRUES.

(b) In support of claims for damage to property which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to completely execute this form or to supply the requested material within two years from the date the allegations accrued may render your claim "invalid". A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

**Failure to specify a sum certain will result in invalid presentation of your claim And may result in forfeiture of your rights.**

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or other aspect of this collection of information, including suggestions for reducing this burden,

to Director, Torts Branch
    Civil Division
    U.S. Department of Justice
    Washington, DC 20530

and to the
Office of Management and Budget
Paperwork Reduction Project (1105-0008)
Washington, DC  20503

## INSURANCE COVERAGE

In order that subrogation claims be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

| | |
|---|---|
| 15.    Do you carry accident insurance?     Yes, if yes give name and address of insurance company (*Number, street, city, State, and Zip Code*) and policy number.     No | |

| | |
|---|---|
| 16.    Have you filed claim on your insurance carrier in this instance, and if so, is it full coverage or deductible? | 17. If deductible, state amount |

18.   If claim has been filed with your carrier, what action has your insurer taken or proposes to take with reference to your claim? (*It is necessary that you ascertain these facts*)

19.   Do you carry public liability and property damage insurance?    Yes, If yes, give name and address of insurance carrier (*Number, street, city, State, and Zip Code*)     No

SF 95 (Rev. 7-85) BACK

**\* U.S. GOVERNMENT PRINTING OFFICE: 1989--241-175**

# VA MEDICAL CENTER
50 IRVING ST., NW
WASHINGTON, DC 20422

## PATIENT ADVOCATES' OFFICE
(202) 745-8588

# COMPLAINT FORM

NAME: _JOSEPH ROBINSON_

SSN: _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_

TELE NO: _(703) 550-9614 (Home)_

I. **CHECK THE APPROPRIATE STATEMENT BELOW:**

    \_\_\_\_ I WANT TO HAVE MY COMPLAINT ON **RECORD ONLY.**

    _X_ THIS IS A **FORMAL COMPLAINT** AND I WANT TO RECEIVE A RESPONSE.

    \_\_\_\_ I WILL CONTACT YOU TO DISCUSS THIS COMPLAINT FURTHER.

    \_\_\_\_ NO FURTHER DISCUSSION IS NEEDED.

    \_\_\_\_ THIS COMPLAINT **INVOLVES** A VIOLATION OF MY PATIENT RIGHTS AS LISTED IN THE **PATIENTS RIGHTS AND RESPONSIBILITIES BOOKLET.**

    \_\_\_\_ THIS COMPLAINT **DOES NOT INVOLVE** A VIOLATION OF MY PATIENT RIGHTS.

**NOTE:** IF THERE IS A PATIENT RIGHTS VIOLATION, BE SURE TO IDENTIFY WHICH RIGHT HAS BEEN VIOLATED, HOW IT WAS VIOLATED, WHEN IT WAS VIOLATED AND BY WHOM THAT VIOLATED THE RIGHT.

II. **COMPLAINT:**

_THAT MR. JOSEPH ROBINSON WAS LEFT UNATTENDED FOR AN UNDETERMINED AMOUNT OF TIME, ON THE NURSING HOME CARE UNIT PATIO AND HE DIED FROM NEGLECT._

(More space on the other side)
Rev. 6/26/02

VA FORM 10-1349
MAR 1999

GOVERNMENT OF THE DISTRICT OF COLUMBIA — DEPARTMENT OF HUMAN SERVICES
CERTIFICATE OF DEATH    File Number 108

2003 MY 14 PM 2: 13

e Date

030002323

ENTRIES
SHOULD BE
TYPEWRITTEN
ONLY
USE
BLACK
RIBBON.

| 1. DECEDENT'S NAME (First,Middle,Last) | | | 2. SEX | 3a. DATE OF DEATH (Month, Day,Year) | 3b. HOUR OF DEATH |
|---|---|---|---|---|---|
| JOSEPH | ROBINSON | | MALE | APRIL 27, 2003 | 5:00 PM |

| 4. SOCIAL SECURITY NUMBER | 5a. AGE-Last Birthday (Years) | 5b. UNDER 1 YEAR | | 5c. UNDER 24 HOURS | | 6. DATE OF BIRTH (Month, Day,Year) | 7. BIRTHPLACE (City and State or Foreign Country) |
|---|---|---|---|---|---|---|---|
| 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 | 92 | Months | Days | Hours | Minutes | January 1, 1911 | South Carolina |

**DECEDENT**

| 8. WAS DECEDENT EVER IN U.S. ARMED FORCES? (Yes or no) Yes | 8. PLACE OF DEATH (Check only one, see instructions on other side) |
|---|---|
| | HOSPITAL: ☑ Inpatient ☐ ER/Outpatient ☐ DOA    OTHER: ☐ Nursing Home ☐ Residence ☐ Other (Specify) |

| 9b. FACILITY NAME (If not institution, give street and number) | 9c. CITY, TOWN, OR LOCATION OF DEATH | 9d. CITIZEN OF WHAT COUNTRY |
|---|---|---|
| VETERANS AFFAIRS MEDICAL CENTER | WASHINGTON, D. C. | USA |

| 10. MARITAL STATUS – Married, Never Married, Widowed, Divorced (Specify) | 11. SURVIVING SPOUSE (If wife, give maiden name) | 12a. DECEDENT'S USUAL OCCUPATION (Give kind of work done during most of working life. Do not use retired.) | 12b. KIND OF BUSINESS/INDUSTRY |
|---|---|---|---|
| Widowed | | Retired Military | Air Force |
| | | | 12c. ☐ MANUFACTURER ☐ WHOLESALER    ☐ RETAILER |

**INSTRUCTIONS OTHER SIDE**

| 13a. RESIDENCE - STATE | 13b. COUNTY | 13c. CITY, TOWN, OR LOCATION | 13d. STREET AND NUMBER |
|---|---|---|---|
| Va. | Fairfax Co. | Alexandria | 6721 Royal Thomas Way |

| 13e. INSIDE CITY LIMITS? (Yes or no) Yes | 13f. ZIP CODE 22315 | 14. WAS DECEDENT OF HISPANIC ORIGIN? (Specify No or Yes—If yes, specify Cuban Mexican, Puerto Rican, etc.) ☒ No ☐ Yes Specify: | 15. RACE – American Indian, Black, White, etc. (Specify) Black | 16. DECEDENT'S EDUCATION (Specify only highest grade completed) Elementary/Secondary (0-12) 12    College (1-4 or 5 + ) |
|---|---|---|---|---|

**PARENTS**

| 17. FATHER'S NAME (First,Middle,Last) | 18. MOTHER'S NAME (First,Middle,Maiden Surname) |
|---|---|
| Alonza Robinson | Phoebe Keith |

**INFORMANT**

| 19a. INFORMANT'S NAME Daughter Stephanie A. Robinson | 19b. RELATIONSHIP TO DECEDENT Daughter | 19c. MAILING ADDRESS (Street and Number or Rural Route Number, City or Town, State, Zip Code) 6721 Royal Thomas Way Alexandria, Virginia    22315 |
|---|---|---|

**DISPOSITION**

| 20a. METHOD OF DISPOSITION ☒ Burial ☐ Cremation ☐ Removal from State ☐ Donation ☐ Other (Specify) | 20b. DATE OF DISPOSITION 5/8/2003 | 20c. PLACE OF DISPOSITION (Name of cemetery, crematory, or other place) Arlington National Cemetery | 20d. LOCATION – City or Town, State Arlington, Va. |
|---|---|---|---|

| 21a. SIGNATURE OF FUNERAL DIRECTOR *Ralph Williams* | 21b. LICENSE NUMBER (of Licensee) 750 | 22. NAME AND ADDRESS OF FACILITY Ralph Williams Funeral Service 517 - 11th St.,SE; Wash.,DC 20003 |
|---|---|---|

| 23a. WAS CASE REFERRED TO MEDICAL EXAMINER/CORONER? (Yes or No) If Yes, Type Med. Ex: Name GERTRUDE JUSTE-HJARDEMAAL, M.D. | 23b. DATE 04-28-03 | 24. IF DECEDENT WAS MARRIED WOMAN, ENTER MAIDEN NAME (First,Middle,Last) |
|---|---|---|

| 25. PART I. Enter the diseases, injuries, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest shock, or heart failure. List only one cause on each line. | Approximate Interval Between Onset and Death |
|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death)    a. PENDING | |
| DUE TO (OR AS A CONSEQUENCE OF): | |
| Sequentially list conditions, if any, leading to immediate cause. Enter UNDERLYING CAUSE (Disease or injury that initiated events resulting in death) LAST    B. | |
| DUE TO (OR AS A CONSEQUENCE OF): | |
| C. | |
| DUE TO (OR AS A CONSEQUENCE OF): | |
| D. | |

**INSTRUCTIONS OTHER SIDE**

**CAUSE OF DEATH**

| PART II.    Other significant conditions contributing to death but not resulting in the underlying cause given in Part I. | 26a. WAS AN AUTOPSY PERFORMED? (Yes or no) YES | 26b. WERE AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH? (Yes or no) n/a |
|---|---|---|

| 27. MANNER OF DEATH ☐ Natural ☐ Pending Investigation ☐ Accident ☐ Suicide ☐ Could not be Determined ☐ Homicide | 28a. DATE OF INJURY (Month,Day,Year) | 28b. TIME OF INJURY | 28c. INJURY AT WORK? (Yes or no) | 28d. DESCRIBE HOW INJURY OCCURRED |
|---|---|---|---|---|
| | 28e. PLACE OF INJURY – At home, farm, street, factory, office building, etc. (Specify) | | | 28f. LOCATION (Street and Number or Rural Route Number, City or Town State) |

| 29. I certify that (I)(this hospital) attended the deceased from _____ 20__ to _____ 20__ that (I)(we) last saw the deceased alive on_____ and that death occurred from the causes and on the date and hour stated above. |
|---|

**CERTIFIER**

| 30a. SIGNATURE *Sarah M Colvin, MD* | ATTENDING PHYS. ☐    MEDICAL DIRECTOR ☐    STAFF PHYS. ☐ | 30b. DATE SIGNED APRIL 29, 2003 |
|---|---|---|
| 30c. PHYSICIAN'S NAME (Type) SARAH M. COLVIN, M.D. | 30d. ADDRESS | |

| 31. WAS DECEDENT PREGNANT IN PAST 12 MOS.? ☐ YES ☐ NO    • IF UNDER 4 YEARS, ENTER PLACE OF BIRTH—HOSPITAL OR ADDRESS IF NOT IN HOSPITAL | REMARKS: OCME# 03-1469 | Authority For Cremation Granted By: Medical Examiner    Date |
|---|---|---|

59
/01

---

I CERTIFY THAT THE ABOVE IS A TRUE AND CORRECT COPY OF THE
ORIGINAL CERTIFICATE FILED WITH THE VITAL RECORDS DIVISION,
DISTRICT OF COLUMBIA, DEPARTMENT OF HEALTH.

WARNING: IT IS UNLAWFUL TO MAKE COPIES OF THIS DOCUMENT
AND PRESENT THEM AS AN ORGINAL CERTIFICATE COPY OR COPY
OF A VITAL RECORD.

August 25, 2003    *Carl W. Wilson*
DATE ISSUED    CARL W. WILSON, REGISTRAR

## Employees
*Ramona T. Jean
*LaShawn
*Betavia
*Donna
*Pam
*Jackie
*Ms. Jones
*Helen (K Wing)
Georgia (K Wing)
*Bettye Williams (Head Nurse)
*Ashi (ext. 6411)
Dining Room Staff who worked that Sunday
*Dr. Yelena Melyakova
*Dr. Almakki
Dr. Karen Ann Blackstone (ext. 5042)
Larry Trail (ext. 6411)
Donna Bettis (ext. 6411)
Millie (Restorative Therapist)
Interdisciplinary Team
Speak with Patient Advocates (Keith Pierce, Doris Lane, Mr. Ball)
Speak with Social Workers
- Mr. Larry Goldman (ext. 7231)
- Rick Evans (ext. 5859)
Speak with Recreational Therapists
- Elizabeth
- Lucille (ext. 2216, 4003)
Speak with Geriatric Clinic Staff
- Dr. Hodge
- Dori
Kathy Delligatti, Quality Management
Earl Newsome (ext. 8212)
*Roger Hailes, AOD

## Residents
*Ms. Alyce Dixon
*Mr. Griffin (Uncle's Roommate)

*Mr. Moore
*50/50
*Mr. Potter
*BJ Smith
Mr. Condiff
*Frank Brown

## Visitors of VAMC NHCU
Visitor who reported that my Uncle needed attention to Nurse on K Wing
Mr. Peter Muller (visits patient at NHCU) (703) 222-5728
Mr. Condiff's Nephew
Ms. Jones (visitor of Mr. Condiff)

## Battle Transportation Staff
Eddie (202) 462-8658

## Washington D.C. Medical Examiner's Office
*Mr. Larry Graves (202) 698-9021
Dr. Colvin (202) 698-9000

## Ralph Williams Funeral Home
Mr. & Mrs. Ralph Williams (202) 544-3079

****Julie Anson (703) 313-7912 (Cared for my Uncle Full-time since 1993)
339-3608

May 16, 2003

Department of Veterans Affairs
Office of Inspector General
801 Eye Street, N.W.
Washington, DC 20001

Dear Office of Inspector General;

I am writing this letter to file a formal complaint again the Washington DC, VAMC's Director, Mr. Garfunkel and the Chief of Geriatrics (Ms. Evelyn Romano) and the Chief of Nursing (Ms. Margaret Downing) and the Chief of the Nursing Home Care Unit for mismanagement. The Director and the Chiefs of Geriatrics, Nursing and the Nursing Home Care Unit failed to ensure proper policies and procedures were met and maintained regarding patient care of the nursing home care unit (NHCU).

My Uncle, Joseph Robinson died on April 27, 2003 I believe due to negligence on the part of the nursing staff in the H Wing at the nursing home. Mr. Joseph Robinson was left unattended for a period of three hours or more on the patio, without water or medication. Mr. Joseph Robinson has been a patient of the NHCU since February of 2001 and he suffers from dementia, he is legally blind from glaucoma, he is 92 years old, he has seizure disorders and congestive heart failure. And Mr. Joseph Robinson is a grave "fall risk".

He was on the patio with no nursing assistance from the morning of April 27th, until he was found by a visitor of another NHCU patient around 5:00 p.m. I was on my way to the Nursing Home and received a phone call on my cellphone, that he was found approximately 5:23 p.m. and he was unresponsive. When I asked how he was now, the Resident told me that "he died". The name of the resident is Dr. MelyaKova Almlakki??? She was insensitive to a situation that was to say the least gravely sensitive to me.

I am writing the OIG's office as a concerned caregiver and I would like some answers to what happened to my Uncle on that Sunday, April 27th. I have received phone calls as well as comments from VAMC employees and NHCU residents and family members of other NHCU residents, that they are very angry at how my Uncle was allowed to die. They told me that they believe that my Uncle was neglected and that they are angry and concerned that the VAMC senior management staff will do everything to cover this incident up. They told me that the VAMC senior management staff will try and protect one another by saying that this is just a simple death attributed to an elderly patient's heart condition. They and I say that my Uncle should not have died on the patio, on an extremely warm and humid Sunday on April 27th.

Based on my frequent visits to the VAMC and the NHCU I am fully aware of problems with the nursing shortage and the staff. Patients have told me that they have not had baths regularly. Patients have told me that nurses neglect them intentionally. I am aware of nurses bringing in foods to patients that are harmful to the patients' health. I am aware of a very dangerous situation with a patient, Mr. Meyers, who has Alzheimer's and is allowed to roam around the halls and from room to run and he has fallen several times. The NHCU is not staffed appropriate to care for severe Alzheimer's patients. There are several patients that are fall risk and the NHCU staff and senior management has not followed proper procedures and policies to safeguard these patients.

I am also aware that the nursing staff is not always attuned to patient care. One nursing technician in particular comes to work just on weekends and works a double or triple shift, and sleeps and does her homework. I believe that that same nursing technician was assigned to Mr. Joseph Robinson on that terrible Sunday, April 27th, when he was left unattended on the patio for several hours. Her name is Batavia.

This complaint is a request for accountability of the VAMC and NHCU senior management staff. Change is definitely needed at the Washington VAMC and the Nursing Home Care Unit. My uncle is a 100% disabled veteran who served this county in World War II and in the Korean War and he should have been better cared for by the Department of Veterans Affairs, Washington VAMC and Nursing Home Care Unit. This is the ultimate sacrifice that my Uncle, Joseph Robinson made, however, I would like to see accountability and change for other patients and veterans that have served this country. They deserve better care, isn't that why this Department exists?

I believe that due to the mismanagement of senior officials at the VAMC my Uncle died. Mr. Joseph Robinson was not properly administered his medication that day, particularly his breathing medicine, which he needed. Also, the D.C. Medical Examiner and the Undertaker that handled his remains questioned how long he sat in the outside heat because of the condition of his body during the autopsy and the handling of his remains.

I am also concerned that the VAMC senior management staff will try and cover this incident up. However, in my professional opinion as an employee of the Department of Veterans Affairs, and an employee of the Office of the Inspector General, the VAMC Nursing Home Care unit needs a complete, thorough and object review of nursing practices, and patient care procedures. Senior staff needs to be held accountable for the death of my Uncle, Joseph Robinson. I request a complete review by the Medical Inspectors and the Health Care Inspectors.

Request your prompt attention in this matter. Please contact me for further information. My home phone is (703) 565-5710 and my work number is (202)

```
-----------------------------------------------------------------
MEDICAL RECORD                                    Progress Notes
-----------------------------------------------------------------
NOTE DATED: 04/25/2003 16:22  NURS CNRC PROGRESS NOTE
ADMITTED: 02/12/2001 13:50 2H WING (NHCU)
Vitals:
   BP: 134/67 (04/18/2003 09:20)
   P: 66 (04/18/2003 09:20)
   RR: 18 (04/04/2003 13:45)
   T: 97.4 F [36.3 C] (03/28/2003 14:56)
   WEIGHT: 190 lb [86.4 kg] (04/15/2003 15:13)
   PAIN INTENSITY (0-10): 0 (03/19/2003 23:21)
Pt. returned from Pass at 2:30pm. Alert and oriented. Very happy and did
not verbalize any complaints. Will resume supportive care.

             Signed by: /es/ MADLYN BELCHER
                        MADLYN BELCHER, RN. 04/25/2003 16:24
```

```
--------------------------------------------------------------------
MEDICAL RECORD                                    Progress Notes
--------------------------------------------------------------------
NOTE DATED: 04/26/2003 14:50  RESTORATIVE CARE CNRC PROGRESS NOTE
ADMITTED: 02/12/2001 13:50 2H WING (NHCU)
The patient was seen today for Restorative Therapy:Walking
 (x) Patient walked independantly with Restorative Aide
 () Patient walked with supervision and cueing from Aide
 () Patient walked with support/physical assist from aide
 (x) Patient walked using cane, walker, or other assistive device
 () Patient walked 1/2 length of hallway or less
 () Patient walked 1/2 to 3/4 length of hallway
 () Patient walked 3/4 to full length of hallway
 () Patient walked from his/her room to dining room/atrium
 (x
) Patient walked from his/her room to dining room/atrium /back to room
 () Patient walked other specified distance:
 () Reinforced teaching on safe use of assistive device


Restorative Toileting

(x) Patient toileted q 2-3 hrs during day
() Patient toileted q 3-4 hrs during day
() Patient refused toileting one or more times
() Patient voided in toilet one or more times
() Patient voided in toilet every time toileted
() Pt did not void in toilet, despite attempt
() Pt had BM in toilet one or more times
() If BM, time of BM:
() Patient self toileted no void or BM
() Patient toileted self, voided, and/or had BM
   used urinal prn for voiding.

            Signed by: /es/ MILDRED RODGERS
                       NA 04/26/2003 14:51
```

```
-----------------------------------------------------------------------
MEDICAL RECORD                                          Progress Notes
-----------------------------------------------------------------------
NOTE DATED: 04/27/2003 18:26  GERIATRIC MEDICINE CNRC PROGRESS NOTE
ADMITTED: 02/12/2001 13:50 2H WING (NHCU)
Called by the nurse that patient was found non-responsive in the wheel chair
on the porch at 5:26 pm.  Patient had no pulpable pulse and no detectable
pressure.  He was brought in the ward and resaucitation was attemped
unsuccessfully.
Patient was pronounced dead by medical resident.  I called patien's niece
Mrs.Robinson and told her that her uncle died.  She said that she would come
immediately to the hospital.
```

```
                Signed by: /es/ YELENA MELYAKOVA
                          MD. GERIATRIC FELLOW 04/27/2003 18:41
              Cosigned by: /es/ KAREN ANN BLACKSTONE
                          MD 04/28/2003 09:59
```

```
04/28/2003 09:59    ADDENDUM
Veteran and neice very well known to me - I spoke with Ms. Robinson last
evening approx 8pm as well as this morning in the presence of Mr. Newsome
and Mrs. Romano.

Sudden death, likley cardiac in origin. yesterday afternoon.  Chart
reveiwed and staff and residents interviewed - no sign of distress in days
prior or on day of death.  Enjoyed weeklong pass with family last week
without change in medical condition.  Day of death, no shortness of breath,
no chest pains reported, ate lunch well and was in usual bright cheerful
singing mood.  Was out on patio x 3 hours, witnessed to appear to be
sleeping by other residents, and found unresponsive at approx 5 pm.
Attempted resuscitation not successful, pronounced deceased.

Neice has been informed of my complete understanding of the issues
surrounding his death - and I suspect coronary artery disease and MI to be
the cause of death.  There is no history of recent fall, and the patient
was found sitting upright in his chair on the patio.  There is no history
of aspiration, although he is prone to aspirate especailly when eating
meals quickly.

Neice has requested autopsy - will meet with decedent affairs and another
conference with myself and Mrs. Romano this morning.
                Signed by: /es/ KAREN ANN BLACKSTONE
                          MD 04/28/2003 10:04
```

```
-----------------------------------------------------------------------
ROBINSON,JOSEPH NMN           WASHINGTON       Printed:04/28/2003 11:42
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 DOB:01/01/1911   Pt Loc: OUTPATIENT              Vice SF 509
-----------------------------------------------------------------------
```

```
-----------------------------------------------------------------
MEDICAL RECORD                                    Progress Notes
-----------------------------------------------------------------
NOTE DATED: 04/27/2003 18:26  GERIATRIC MEDICINE CNRC PROGRESS NOTE
ADMITTED: 02/12/2001 13:50 2H WING (NHCU)
Called by the nurse that patient was found non-responsive in the wheel chair
on the porch at 5:26 pm.  Patient had no pulpable pulse and no detectable
pressure.  He was brought in the ward and resaucitation was attemped
unsuccessfully.
Patient was pronounced dead by medical resident.  I called patien's niece
Mrs.Robinson and told her that her uncle died.  She said that she would come
immediately to the hospital.



                Signed by: /es/ YELENA MELYAKOVA
                              MD, GERIATRIC FELLOW 04/27/2003 18:41
             Cosigned by: /es/ KAREN ANN BLACKSTONE
                              MD 04/28/2003 09:59


04/28/2003 09:59     ADDENDUM
Veteran and neice very well known to me - I spoke with Ms. Robinson last
evening approx 8pm as well as this morning in the presence of Mr. Newsome
and Mrs. Romano.

Sudden death, likley cardiac in origin, yesterday afternoon.  Chart
reveiwed and staff and residents interviewed - no sign of distress in days
prior or on day of death.  Enjoyed weeklong pass with family last week
without change in medical condition.  Day of death, no shortness of breath,
no chest pains reported, ate lunch well and was in usual bright cheerful
singing mood.  Was out on patio x 3 hours, witnessed to appear to be
sleeping by other residents, and found unresponsive at approx 5 pm.
Attempted resuscitation not successful, pronounced deceased.

Neice has been informed of my complete understanding of the issues
surrounding his death - and I suspect coronary artery disease and MI to be
the cause of death.  There is no history of recent fall, and the patient
was found sitting upright in his chair on the patio.  There is no history
of aspiration, although he is prone to aspirate especailly when eating
meals quickly.

Neice has requested autopsy - will meet with decedent affairs and another
conference with myself and Mrs. Romano this morning.
                Signed by: /es/ KAREN ANN BLACKSTONE
                              MD 04/28/2003 10:04
```

```
-----------------------------------------------------------------
ROBINSON,JOSEPH NMN          WASHINGTON       Printed:04/28/2003 11:42
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 DOB:01/01/1911   Pt Loc: OUTPATIENT              Vice SF 509
-----------------------------------------------------------------
```

```
-----------------------------------------------------------------------
MEDICAL RECORD                                          Progress Notes
-----------------------------------------------------------------------
NOTE DATED: 04/27/2003 18:42  CODE BLU: MULTIDISCIPLINARY TEAM NOTE
ADMITTED: 02/12/2001 13:50 2H WING (NHCU)
                    Code Blu: Nursing Summary
Patient found by (name):Choi, Rn from K-wing.
    Where:South Patio
    Time:@5:23pm
    Status/Condition:Unresponsive

Initial resuscitation efforts were started immediately by calling for
assistance and initiating BCLS.

Code Blu Team was called.

Patient Outcome: Expired

Patient Disposition: Other (specify): Morgue

Narrative Summary:
Patient found unresponsive in the South Patio.
Another patient was talking to him and he did
not respond, and called for help.  Ms Choi, Rn
and two nurses from H-wing went.  A code was
called , he was brought back to his room.  Code
team arrived and attempt was unsuccessful.  His
skin is peeling while his clothes was taken
off. He was pronounced @ 5:38 by Dr. Almakki.
On call physician notified and NOK made aware.
Awaiting for her arrival.

                Signed by: /es/ RAYMONNA T JEAN
                           RN 04/27/2003 19:00
```

---
```
MEDICAL RECORD                                    Progress Notes
```
---

```
NOTE DATED: 04/27/2003 18:42  CODE BLU: MULTIDISCIPLINARY TEAM NOTE
ADMITTED: 02/12/2001 13:50 2H WING (NHCU)
                    Code Blu: Nursing Summary
Patient found by (name):Choi, Rn from K-wing.
   Where:South Patio
   Time:05:23pm
  Status/Condition:Unresponsive
```

Initial resuscitation efforts were started immediately by calling for
assistance and initiating BCLS.

Code Blu Team was called.

Patient Outcome: Expired

Patient Disposition: Other (specify): Morgue

```
Narrative Summary:
Patient found unresponsive in the South Patio.
Another patient was talking to him and he did
not respond, and called for help. Ms Choi, Rn
and two nurses from H-wing went.  A code was
called , he was brought back to his room.  Code
team arrived and attempt was unsuccessful.  His
skin is peeling while his clothes was taken
off. He was pronounced @ 5:38 by Dr Almakki.
On call physician notified and NOK made aware.
Awaiting for her arrival.
```

```
            Signed by: /es/ RAYMONNA T JEAN
                       RN 04/27/2003 19:00
```

---
```
ROBINSON,JOSEPH NMN            WASHINGTON       Printed:04/28/2003 11:42
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 DOB:01/01/1911  Pt Loc: OUTPATIENT              Vice SF 509
```
---

```
--------------------------------------------------------------------------
MEDICAL RECORD                                        Progress Notes
--------------------------------------------------------------------------
NOTE DATED: 04/27/2003 23:37  NURS CNRC PROGRESS NOTE
ADMITTED: 02/12/2001 13:50 2H WING (NHCU)
Vitals:
   BP: 134/67 (04/18/2003 09:20)
   P: 66 (04/18/2003 09:20)
   RR: 18 (04/04/2003 13:45)
   T: 97.4 F [36.3 C] (03/28/2003 14:56)
   WEIGHT: 190 lb [86.4 kg] (04/15/2003 15:13)
   PAIN INTENSITY (0-10): 0 (03/19/2003 23:21)
Mr Robinson's niece, Stephanie, came and was here for a few hours.  Dr
Melyakova was made aware.  Dr Blackstone spoke to her.  She had gone to
see the AOD. She stated to leave his belongings in the room, she will be
back in the morning.  She left @ 10pm. and the body was taken to the
morgue after that.

             Signed by: /es/ RAYMONNA T JEAN
                        RN 04/27/2003 23:44
```

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 EXPIRES 6-30-01 |
|---|---|---|

| 1. Submit To Appropriate Federal Agency: | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, street, city, State and Zip Code) |
|---|---|
| Department of Veterans Affaires | STEPHANIE A. ROBINSON 6721 Royal Thomas Way ALEXANDRIA, VA - 22315 |

| 3. TYPE OF EMPLOYMENT MILITARY CIVILIAN | 4. DATE OF BIRTH 1-23-1955 | 5. MARITAL STATUS Single | 6. DATE AND DAY OF ACCIDENT April 27, 2003 | 7. TIME (A.M. OR P.M) 5:58 P.M. |
|---|---|---|---|---|

**8. Basis of Claim** *(State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof) (Use additional pages if necessary.)*

I am claiming benefits as a result of negligence and wrongful death on behalf of my Uncle and Adopted father, Joseph Robinson (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) He died at the Washington VAMC Nursing Home Care Unit after being left unattended for an extended period of 3-5 hours, outside on the patio VA Claim # 22-085-379.

**9. PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT *(Number, street, city, State, and Zip Code)*

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. *(See instructions on reverse side)*

**10. PERSONAL INJURY/WRONGFUL DEATH**

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

Mr. Joseph Robinson was left on the patio unattended for approximately 5 hours. He was a grave fall risk, in a wheelchair, legally blind, Respiratory illness and he did not receive his medications during the timeframe left unattended.

**11. WITNESSES**

| NAME | ADDRESS (Number, street, city, State, and Zip Code) |
|---|---|
| See attached listing. | See attached listing. |

**12.** *(See instructions on reverse)* **AMOUNT OF CLAIM** *(in dollars)*

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL *(Failure to specify may cause forfeiture of your rights.)* |
|---|---|---|---|
| | | $21,000,000.00 | $21,000,000.00 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT *(See instructions on reverse side.)* | 13b. Phone number of signatory | 14. DATE OF CLAIM 4-27-2004 |
|---|---|---|
| Stephanie A. Robinson | | |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant shall forfeit and pay to the United States the sum of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the United States. *(See 31 U.S.C. 3729.)* | Imprisonment for not more than five years and shall be subject to a fine of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the United States. *(See 18 U.S.C.A. 287.)* |

| 95-108 Previous editions not usable | NSN 7540-00-634-4046 | STANDARD FORM 95 (Rev. 7-85) PRESCRIBED BY DEPT. OF JUSTICE 28 CFR 14.2 |
|---|---|---|

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.

C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.

D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

## INSTRUCTIONS

### Complete all items – Insert the word NONE where applicable

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF

Any instructions or information necessary in the preparation of your claim will be furnished, upon request, by the office indicated in item #1 on the reverse side. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplemental regulations also. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with said claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file claim for both personal injury and property damage, claim for both must be shown in item #12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT, THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

(b) In support of claims for damage to property which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to completely execute this form or to supply the requested material within two years from the date the allegations accrued may render your claim "invalid". A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

**Failure to specify a sum certain will result in invalid presentation of your claim And may result in forfeiture of your rights.**

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or other aspect of this collection of information, including suggestions for reducing this burden,
to Director, Torts Branch
   Civil Division
   U.S. Department of Justice
   Washington, DC 20530

and to the
Office of Management and Budget
Paperwork Reduction Project (1105-0008)
Washington, DC 20503

## INSURANCE COVERAGE

In order that subrogation claims be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance?  Yes, if yes give name and address of insurance company *(Number, street, city, State, and Zip Code)* and policy number.  **No**

16. Have you filed claim on your insurance carrier in this instance, and if so, is it full coverage or deductible?

17. If deductible, state amount

18. If claim has been filed with your carrier, what action has your insurer taken or proposes to take with reference to your claim? *(It is necessary that you ascertain these facts)*

19. Do you carry public liability and property damage insurance?  Yes, If yes, give name and address of insurance carrier *(Number, street, city, State, and Zip Code)*  **No**

SF 95 (Rev. 7-85) BACK

**\* U.S. GOVERNMENT PRINTING OFFICE: 1989--241-175**

TOUCAN BUSINESS FORMS, INC. ® (202) 543-0162

03-1469

**GOVERNMENT OF THE DISTRICT OF COLUMBIA DEPARTMENT OF HUMAN SERVICES**
**CERTIFICATE OF DEATH**

File Number 108- **030002323**

| File Date | ENTRIES SHOULD BE TYPEWRITTEN ONLY USE BLACK RIBBON. |
|---|---|

2003 MAY 14 P...

**DECEDENT**

| 1. DECEDENT'S NAME (First, Middle, Last) | | 2. SEX | 3a. DATE OF DEATH (Month, Day, Year) | 3b. HOUR OF DEATH |
|---|---|---|---|---|
| JOSEPH | ROBINSON | MALE | APRIL 27, 2003 | 5:00 PM |

| 4. SOCIAL SECURITY NUMBER | 5a. AGE–Last Birthday (Years) | 5b. UNDER 1 YEAR Months / Days | 5c. UNDER 24 HOURS Hours / Minutes | 6. DATE OF BIRTH (Month, Day, Year) | 7. BIRTHPLACE (City and State or Foreign Country) |
|---|---|---|---|---|---|
| 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 | 92 | | | January 1, 1911 | South Carolina |

| 8. WAS DECEDENT EVER IN U.S. ARMED FORCES? (Yes or No) | 9a. PLACE OF DEATH (Check only one; see instructions on other side) |
|---|---|
| Yes | HOSPITAL: ☒ Inpatient ☐ ER/Outpatient ☐ DOA   OTHER: ☐ Nursing Home ☐ Residence ☐ Other (Specify) |

| 9b. FACILITY NAME (If not institution, give street and number) | 9c. CITY, TOWN, OR LOCATION OF DEATH | 9d. CITIZEN OF WHAT COUNTRY |
|---|---|---|
| VETERANS AFFAIRS MEDICAL CENTER | WASHINGTON, D. C. | USA |

| 10. MARITAL STATUS – Married, Never Married, Widowed, Divorced (Specify) | 11. SURVIVING SPOUSE (If wife, give maiden name) | 12a. DECEDENT'S USUAL OCCUPATION (Give kind of work done during most of working life. Do not use retired.) | 12b. KIND OF BUSINESS/INDUSTRY |
|---|---|---|---|
| Widowed | -- | Retired Military | Air Force |
| | | | 12c. MANUFACTURER ☐   WHOLESALER ☐   RETAILER ☐ |

| 13a. RESIDENCE – STATE | 13b. COUNTY | 13c. CITY, TOWN, OR LOCATION | 13d. STREET AND NUMBER |
|---|---|---|---|
| Va. | Fairfax Co. | Alexandria | 6721 Royal Thomas Way |

| 13e. INSIDE CITY LIMITS? (Yes or no) | 13f. ZIP CODE | 14. WAS DECEDENT OF HISPANIC ORIGIN? (Specify No or Yes—If yes, specify Cuban Mexican, Puerto Rican, etc.) ☒ No ☐ Yes  Specify: | 15. RACE – American Indian, Black, White, etc. | 16. DECEDENT'S EDUCATION (Specify only highest grade completed) |
|---|---|---|---|---|
| Yes | 22315 | | Black | Elementary/Secondary (0-12) 12   College (14 or 5 + ) |

**PARENTS**

| 17. FATHER'S NAME (First, Middle, Last) | 18. MOTHER'S NAME (First, Middle, Maiden Surname) |
|---|---|
| Alonza Robinson | Phoebe Keith |

**INFORMANT**

| 19a. INFORMANT'S NAME | 19b. RELATIONSHIP TO DECEDENT | 19c. MAILING ADDRESS (Street and Number or Rural Route Number, City or Town, State, Zip Code) |
|---|---|---|
| Stephanie A. Robinson Daughter | Daughter | 6721 Royal Thomas Way Alexandria, Virginia  22315 |

**DISPOSITION**

| 20a. METHOD OF DISPOSITION ☒ Burial ☐ Cremation ☐ Removal from State ☐ Donation ☐ Other (Specify) | 20b. DATE OF DISPOSITION | 20c. PLACE OF DISPOSITION (Name of cemetery, crematory, or other place) | 20d. LOCATION – City or Town, State |
|---|---|---|---|
| | 5/8/2003 | Arlington National Cemetery | Arlington, Va. |

| 21a. SIGNATURE OF FUNERAL DIRECTOR | 21b. LICENSE NUMBER (of Licensee) | 22. NAME AND ADDRESS OF FACILITY |
|---|---|---|
| *Ralph Williams* | 750 | Ralph Williams Funeral Service 517 – 11th St., SE, Wash., DC 2003 |

| 23a. WAS CASE REFERRED TO MEDICAL EXAMINER/CORONER? (Yes or No) If Yes, Type Med. Ex. Specify | 23b. DATE | 24. IF DECEDENT WAS MARRIED WOMAN, ENTER MAIDEN NAME (First, Middle, Last) |
|---|---|---|
| GERTRUDE JUSTE-HJARDEMAAL, M.D. | 04-28-03 | |

**CAUSE OF DEATH** / **SEE INSTRUCTIONS ON OTHER SIDE**

25. **PART I.** Enter the diseases, injuries, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest shock, or heart failure. List only one cause on each line.

| | | Approximate Interval Between Onset and Death |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) | a. **PENDING** | |
| | DUE TO (OR AS A CONSEQUENCE OF): | |
| Sequentially list conditions, if any, leading to immediate cause. Enter UNDERLYING CAUSE (Disease or injury that initiated events resulting in death) LAST | b. _____ | |
| | DUE TO (OR AS A CONSEQUENCE OF): | |
| | c. _____ | |
| | DUE TO (OR AS A CONSEQUENCE OF): | |
| | d. _____ | |

| PART II. Other significant conditions contributing to death but not resulting in the underlying cause given in Part I. | 26a. WAS AN AUTOPSY PERFORMED? (Yes or no) | 26b. WERE AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH? (Yes or no) |
|---|---|---|
| | YES | n/a |

| 27. MANNER OF DEATH ☐ Natural ☒ Pending Investigation ☐ Accident ☐ Could not be Determined ☐ Suicide ☐ Homicide | 28a. DATE OF INJURY (Month, Day, Year) | 28b. TIME OF INJURY | 28c. INJURY AT WORK? (Yes or no) | 28d. DESCRIBE HOW INJURY OCCURRED |
|---|---|---|---|---|
| | 28e. PLACE OF INJURY – At home, farm, street, factory, office building, etc. (Specify) | | 28f. LOCATION (Street and Number or Rural Route Number, City or Town, State) | |

29. I certify that (I) this hospital attended the deceased from _____ 20 ___ to _____ 20 ___ that (I) (we) last saw the deceased alive on _____ and that death occurred from the causes and on the date and hour stated above.

**CERTIFIER**

| 30a. SIGNATURE | | | 30b DATE SIGNED |
|---|---|---|---|
| *Sarah M Colvin, MD* | ATTENDING PHYS. ☐   MEDICAL DIRECTOR ☐   STAFF PHYS. ☐ | | APRIL 29, 2003 |
| 30c. PHYSICIAN'S NAME (Type) SARAH M. COLVIN, M.D. | | 30d. ADDRESS | |

| DOH 159 REV. 3/01 | 31. WAS DECEDENT PREGNANT IN PAST 12 MOS? ☐ YES ☐ NO  • IF UNDER 4 Y | REMARKS: OCME# 03 | Authority For Cremation Granted By: |
|---|---|---|---|
| | | | Date |

I CERTIFY THAT THE ABOVE IS A TRUE AND CORRECT COPY OF THE ORIGINAL CERTIFICATE FILED WITH THE VITAL RECORDS DIVISION, DISTRICT OF COLUMBIA, DEPARTMENT OF HEALTH

WARNING: IT IS UNLAWFUL TO MAKE COPIES OF THIS DOCUMENT AND PRESENT THEM AS AN ORGINAL CERTIFICATE COPY OR COPY OF A VITAL RECORD.

May 14, 2003

**DATE ISSUED**

*Earl W. Wilson*
CARL W. WILSON, REGISTRAR